Raymon J. MELTON,
Plaintiff–Appellee/Cross–Appellant,

v.

CITY OF OKLAHOMA CITY, a municipal corporation; Lloyd A. Gramling, Chief of Police for the City of Oklahoma City; Gerald L. Emmett, Assistant Chief of Police for the City of Oklahoma City; Marvin Maxwell, Major, Oklahoma City Police Department; William R. Chambless, Major, Oklahoma City Police Department; Carl Smith, Lieutenant, Oklahoma City Police Department; Robert Taylor, Lieutenant, Oklahoma City Police Department; David McBride, Lieutenant, Oklahoma City Police Department; and Paula Hearn, Assistant to the City Manager, Defendants–Appellants/Cross–Appellees.

Nos. 85–1738 to 85–1742, 85–1811.

United States Court of Appeals,
Tenth Circuit.

June 21, 1989.

Robert D. Allen, Mun. Counselor, and Richard C. Smith, Asst. Mun. Counselor (Lawrence E. Naifeh, Diane D. Huckins, and Jonathan D. Woods, Asst. Mun. Counselors, also on the briefs), Oklahoma City, Okl., for defendants-appellants/cross-appellees.

Steven M. Angel (Carl D. Hughes and Michael Gassaway with him on the briefs), of Hughes & Nelson, Oklahoma City, Okl., for plaintiff-appellee/cross-appellant.

Before McKAY and BALDOCK, Circuit Judges, and SAFFELS, District Judge *.

McKAY, Circuit Judge.

These six appeals arise from a jury verdict and various post-trial orders entered by the United States District Court for the Western District of Oklahoma. Plaintiff, a police officer, was fired by the City of Oklahoma City. Plaintiff sued the City of Oklahoma City under 42 U.S.C. §§ 1983, 1985 and 1988, and 18 U.S.C. §§ 1961–68 (1982), alleging that he was deprived of liberty and property without due process of law and that he was discharged in retaliation for the exercise of his First Amendment speech rights.

## I. FACTS

Raymon J. Melton, a lieutenant with nearly twenty-one years of service in Oklahoma City's police department, was fired for alleged violations of the Police Code of Ethics. Prior to Mr. Melton's termination, the Federal Bureau of Investigation ("FBI") and the United States Attorney were investigating one of Mr. Melton's longtime friends, then-judge William C. Page. In preparation for the Page trial, the federal prosecutor interviewed Mr. Melton whom he considered to be a potential defense witness. At least some of the information discussed with the federal prosecutor during that interview was gained in the course of Mr. Melton's duties as a police officer. In order to protect himself from possible misrepresentation, Mr. Melton covertly taped his interview with the assistant U.S. attorney.

During the interview, Mr. Melton gave the prosecutor what Mr. Melton believed to be exculpatory information concerning Mr. Page. This information was not released to Mr. Page's attorneys.[1] Mr. Page's lawyers subsequently contacted Mr. Melton about testifying for Mr. Page at trial. Mr. Melton discussed the content of his interview with the federal prosecutor with Mr. Page's counsel. He also offered them the recording he had made of the interview.[2]

Mr. Melton and one other policeman testified for the defense at Mr. Page's trial. After the trial, in response to a complaint made by an FBI agent involved in the Page investigation, the Oklahoma City Police Department began an Internal Affairs investigation of Mr. Melton.[3] The investigation centered on two allegations: (1) that Mr. Melton had violated the Police Code of Ethics by disclosing to Mr. Page's counsel the details of a confidential discussion between himself and the federal prosecutor, and (2) that Mr. Melton had perjured himself in an affidavit and during the Page trial. These

* Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation.

1. Mr. Melton believed that the information he gave the federal prosecutor should have been turned over to defense counsel pursuant to *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (upon request by the defense, prosecution cannot suppress evidence favorable to the accused).

2. Mr. Page's counsel used Mr. Melton's tape as the basis for an affidavit which accompanied a Motion to Dismiss because the prosecutor failed to provide exculpatory material to defense counsel under *Brady*. The court hearing the Page trial denied the motion because it found the material was not *Brady* information. At trial on this matter, however, the court instructed the jury that the taped conversation contained *Brady* information that the prosecutor was obligated under court order to turn over to defense counsel in the Page case.

3. The Department also investigated the other officer who testified at the Page trial; he decided to retire from the police department.

allegations and the fact of the Internal Affairs investigation were released to the press by defendant David McBride, the Police Department's Public Information Officer.

Mr. Melton received written notice that as a result of the Internal Affairs Investigation a Disciplinary Review Board would convene to hear the charges. The Review Board convened as scheduled.[4] At his arrival, the Chair informed Mr. Melton that the Board would not entertain discussion nor consider the perjury allegations; rather it would focus solely on the alleged violation of the Police Code of Ethics. After Mr. Melton testified, the Board, by a six-to-one vote, found that he had violated the Code of Ethics and recommended that he be fired. That same day with the approval of the City Manager, defendant Lloyd A. Gramling, Oklahoma City's Chief of Police, fired Mr. Melton. Lieutenant McBride confirmed Mr. Melton's dismissal to the press,[5] but did not comment on the disposition of the perjury charge. Shortly after the dismissal (and without prior notice or hearing) Mr. Melton received a letter from Chief Gramling which forbade plaintiff from representing himself in any way as a retired police officer.[6]

Mr. Melton sued the City of Oklahoma City and some members of the Review Board alleging that he was deprived of property and liberty without due process of law, that he was discharged in retaliation for exercising his free speech rights, and that the City violated federal RICO provisions. He also sought punitive damages against the defendants.

Mr. Melton's RICO claim was dismissed at the close of plaintiff's evidence. The jury rendered a general verdict against the City and certain individual defendants in the amount of $1,272,000. The trial court set aside the punitive damages award against all but one of the defendants on a j.n.o.v. motion.[7] The jury found for the defendants on the section 1985 claim. The City, the individual defendants, and Mr. Melton raise a number of issues on appeal. Their respective contentions are addressed below.

## II. LIABILITY DETERMINATIONS

### A. *Free speech claim.*

On appeal, the City challenges the trial court's First Amendment instruction because it does not address the application of

---

4. The members of the Disciplinary Review Board who were individual defendants in this action are: Board Chair Gerald L. Emmett (Assistant Chief of Police); William R. Chambless (Major, Oklahoma City Police Department), Marvin Maxwell (Major, Oklahoma City Police Department), Robert Taylor (Lieutenant, Oklahoma City Police Department), and Paula Hearn (Assistant to the City Manager).

Members of the Review Board who were not parties to this action are Ted Pollock (Lieutenant, Oklahoma City Police Department) and John Clark (Senior Police Officer, Oklahoma Police Department). Mr. Clark sat on the Board as the representative of the Fraternal Order of Police, the plaintiff's collective bargaining agent.

5. It is undisputed that Lieutenant McBride's statements to the press following Mr. Melton's dismissal were limited to confirming the dismissal and stating, as grounds therefor, the violation of the Police Code of Ethics. Nevertheless, Mr. Melton challenges Lieutenant McBride's actions on the basis of the earlier dissemination of the perjury charges, which Mr. Melton was never allowed to refute and which Lieutenant McBride never withdrew.

6. Although Mr. Melton was dismissed from his employment, his years of service entitled him to receive retirement benefits. Also due to his retirement status, Mr. Melton was entitled under Oklahoma law to retain his "status as peace officer[ ] of the State of Oklahoma, retired, and as such [to] retain the right to keep and bear firearms when approved by the officials of the municipality of retirement." Okla.Stat. tit. 11, § 50–125 (West Supp.1978).

Chief Gramling's letter to Mr. Melton stated:
This letter is to inform you of your status as a retired officer from this Department.

Due to your unmeritorious retirement, you do not retain the privilege or approval to bear firearms or otherwise represent yourself as a commissioned officer of the Oklahoma City Police Department, as provided in State Law 11 O.S. 50–125.

7. The jury found in favor of Lieutenant Carl Smith, the officer who conducted the Internal Affairs investigation, on all causes of action. The jury also exonerated Lieutenant McBride on the First Amendment and deprivation of property claims, but held him liable for deprivation of liberty without due process of law.

the First Amendment in the context of a public employee's speech. In examining a challenge to jury instructions, "we review the record as a whole, to determine whether the instructions 'state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable.'" *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988) (quoting *Ramsey v. Culpepper*, 738 F.2d 1092, 1098 (10th Cir.1984)). We need not address whether this instruction is proper because "[t]he inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983). *See also Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987). Thus, the trial court improperly submitted to the jury the question of whether Mr. Melton's speech was constitutionally protected. However, we find that the court's improper submission of this First Amendment issue to the jury constitutes harmless error because we conclude as a matter of law that Mr. Melton's First Amendment rights were violated.

■ In cases which implicate the First Amendment, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964)). The court's inquiry is a multi-step process. First, the court must determine whether a public employee's speech touches upon a matter of public concern. *Connick*, 461 U.S. 138, 103 S.Ct. 1684. Second, if the statement satisfies the public concern inquiry, the court must then balance the interests of the employee in making the statement against the public employer's interest in the effective and efficient fulfillment of its responsibilities to the public. *Pickering v. Board of Educ.*, 391 U.S. 563,

568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Third, assuming that both previous elements have been found in favor of the plaintiff, he or she must then prove that the protected speech "was a 'motivating factor' in the detrimental employment decision." *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Fourth and finally, if plaintiff makes this showing, the burden then shifts to the employer to show by a preponderance of evidence that it would have reached the same decision in the absence of the protected activity. *Id.* While, as we have already stated, the first two steps of the process involve questions of law for the court, the two-part *Mt. Healthy* analysis involves questions of fact for the jury. *Koch v. City of Hutchinson*, 847 F.2d 1436, 1440 n. 11 (10th Cir.) (en banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).

1. Public concern analysis.

Speech on a matter of public concern is speech which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1688. Under *Connick*, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690 (footnote omitted). *See also Koch v. City of Hutchinson*, 847 F.2d at 1436 (listing factors courts have considered in public concern analysis).

■ Our examination of the record in light of these factors convinces us that Mr. Melton's speech to defense counsel and at trial touched upon a matter of public concern. Mr. Melton's speech clearly related to political, social, or other concerns of the community. However, in determining whether speech is on a matter of public concern, "it is not always enough that 'its *subject matter* could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest.' [*Connick*, 461 U.S. at 148] n. 8 [103 S.Ct. at 1691 n. 8] (emphasis added). What

is actually said on that topic must itself be of public concern." *Wilson v. City of Littleton, Colo.*, 732 F.2d 765, 769 (10th Cir. 1984).

Mr. Page was a public official under investigation and prosecution for malfeasance in his public duties.[8] Of course the public would want, and is arguably entitled to, information relating to a public official's guilt or innocence in a public trial which relates to his public duties. Additionally, Mr. Melton's speech was "calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of government officials in the conduct of their official duties," *Koch*, 847 F.2d at 1445, by revealing what he believed to be exculpatory *Brady* material to Mr. Page's defense counsel and the court—information which might otherwise have been suppressed by the federal prosecutor. *See Connick*, 461 U.S. at 148, 103 S.Ct. at 1690 ("Nor did [the plaintiff] seek to bring to light actual or potential wrongdoing or breach of public trust on the part of [the employer]"). We conclude that Mr. Melton's speech to Mr. Page's defense counsel and at Mr. Page's trial dealt with a matter of "public concern" within the meaning of *Pickering* and its progeny.

### 2. The Pickering balancing.

We find that the balance between the State's interest as an employer in the effective functioning of its public enterprise and Mr. Melton's interest in testifying at trial and his interest in talking with Mr. Page's defense counsel clearly tip in favor of Mr. Melton in both cases.

#### a. Mr. Melton's trial testimony.

■ The First Amendment protects the right to testify truthfully at trial. *Smith v. Hightower*, 693 F.2d 359, 368 (5th Cir.1982). Under *Pickering* balancing we find that Mr. Melton's interest in testifying truthfully at trial easily outweighs the City's interest in preventing the testimony in order to preserve the efficiency and effectiveness of the police department.

Although police officers rarely testify on behalf of criminal defendants, they are frequently called upon to testify at trial. In cases other than those in which officers testify against each other, it is difficult to imagine a situation in which the efficiency and effectiveness of the department would be significantly impaired.[9] It is possible that an officer's testimony might impair harmony among fellow officers if officers disagree on the propriety of such testimony. It may also detrimentally impact on the kind of close working relationships which depend on personal loyalty and confidence. However, truthful trial testimony is unlikely to impair discipline by immediate superiors, interfere with the regular operation of the enterprise or impede the officer's performance of his daily duties.

One troubling aspect of this case concerns the weight to be given in a *Pickering* balance to the State's interest in departmental confidentiality. The need for confidentiality and the resultant disruption caused by its breach in the law enforcement context cannot be gainsaid. Yet, absent circumstances which indicate a serious security risk or a risk that the business of the department will be seriously impaired due to a breach of trust, we feel that the confidentiality of information given at trial is not paramount in assessing the City's interest in preventing trial testimony.

In any event, Mr. Melton's interest in testifying at trial is so strong in this case that any disruption or impairment of the enterprise would have to be extreme in order to justify preventing trial testimony. The City offered no evidence that Mr. Mel-

---

**8.** Mr. Page was being investigated and prosecuted for racketeering activities in his capacity as a public official.

**9.** "[P]ertinent considerations [are] whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987) (citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37).

ton's trial testimony affected the operation of the enterprise.

In addition, Mr. Melton's interest in testifying at trial was compelling. Mr. Melton had a clear public duty to testify. In many instances, that duty might be enhanced by judicial compulsion. Certainly we would not expect a public employee to suffer contempt in order to preserve the efficiency and effectiveness of a public employer, even the police department. Moreover, Mr. Melton had an interest in helping a friend who could be well-served by character testimony and what Mr. Melton believed to be exculpatory material. When we balance Mr. Melton's interests in testifying against what little disruption may occur due to an officer's testimony on behalf of a criminal defendant, we find that Mr. Melton's interest clearly prevails.

### b. Mr. Melton's communication with defense counsel.

■ With respect to Mr. Melton's communication to defense counsel, we find that although the *Pickering* balance is closer than in the case of trial testimony, the balance tips in favor of Mr. Melton.

The City has an interest in preventing Mr. Melton's communication with defense counsel because of its impact on intergovernmental harmony and effectiveness. Obviously, the direct result of a city police officer's communication with defense counsel in a federal prosecution may be the impairment of the department's cooperative relations with federal law enforcement personnel.[10]

Notwithstanding the legitimacy of the City's interest in fostering harmonious relations with other law enforcement agencies, for purposes of *Pickering* balancing greater weight is given to the effect of the

disclosure on *intradepartmental* effectiveness and efficiency. *Pickering* focuses on the balance between the interests of the employee in free speech and "the interest of the State, as an employer, in promoting the efficiency of the public services *it* performs through *its* employees." 391 U.S. at 568, 88 S.Ct. at 1734 (emphasis added). *See also Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987) ("[T]he state interest element of the [*Pickering*] test focuses on the effective functioning of the public employer's enterprise."). Thus, we must examine the extent to which Mr. Melton's communications with Mr. Page's counsel affected *intradepartmental* relationships and performance.

The City's primary, if not exclusive, argument is that it has an interest in preventing this speech in order to protect the confidentiality of communications in a law enforcement context. We agree that breaches of departmental confidentiality could impair discipline and control by immediate superiors, and detrimentally impact on the kind of close working relationships among officers for which personal loyalty and confidence are necessary. We also agree that a breach of departmental confidentiality *could* interfere with the regular operation of the enterprise. If an officer cannot keep police business in the office, he is a potential threat to fellow officers. In addition, neither his peers nor his supervisors could trust him to conduct sensitive investigations. Any breach of confidentiality, therefore, reflects negatively on an officer's ability and competence to perform his job, and each officer's competence affects the overall effectiveness of the department.

■ Although we recognize the *potential* impact that a breach of confidentiality may have on the department, we must point out that the government must intro-

---

10. This court can imagine several situations in which the impairment or disruption of cooperative efforts between law enforcement agencies could affect *inter*governmental effectiveness; for instance, if federal agents and local officers were working together to dismantle a drug ring, or a fencing operation implicating interstate commerce, or the investigation of the assassination of a prominent citizen. In all these cases, if the law enforcement operation were divided by a "turncoat" to the enterprise, arguably neither agency by itself could efficiently, competently, and fully complete the investigation. In addition, if federal agencies feel they cannot trust local law enforcement personnel to cooperate with or at least refrain from disrupting their investigations and prosecutions, they would be more reluctant to engage local law enforcement agencies for the benefit of both.

duce evidence of an actual disruption of its services resulting from the speech at issue. *See Rankin,* 107 S.Ct. at 2899; *Pickering,* 391 U.S. at 570–71, 88 S.Ct. at 1735–36.[11] While the confidentiality claim may, under other circumstances, tip the balance in favor of the government, here the City failed to make its case.

Moreover, we are unpersuaded that the City's fundamental assumption—that any communication between law enforcement officials is by its very nature confidential—is correct. It is undisputed that neither Mr. Melton nor the City Police Department participated in an official capacity in the Page investigation and prosecution; it was solely a federal matter. We view the communication between Mr. Melton and the prosecutor (which in turn was disclosed to Mr. Page's counsel) as one arising *outside* the scope of departmental confidentiality. The transcript of Mr. Melton's interview with the federal prosecutor clearly shows that the prosecutor interviewed Mr. Melton solely because he believed Mr. Melton would probably testify as a defense witness in the Page trial. Furthermore, while we are persuaded that at least some of the information which Mr. Melton possessed initially had been gained in the course of his official duties, the City did not focus on that fact in its confidentiality claim.

Under these circumstances, Mr. Melton's interest in this speech outweighs the City's interest in *intradepartmental* relations. He is under a high duty as a citizen to come forward with information relevant to a federal investigation and prosecution. In addition, Mr. Melton believed that the information he communicated to defense counsel was actual *Brady* material that he was under a duty to supply. Mr. Melton also indicated that he feared if he did not disclose this information, he would be implicated in Mr. Page's activities and possibly suffer prosecution as a result. As with his trial testimony, he believed he was disclosing exculpatory material at the request of defense counsel in a public investigation—information which the federal prosecutor did not otherwise disclose.

3. Protected speech as the "motivating factor" in the dismissal—the Mt. Healthy inquiry.[12]

Having determined that both Mr. Melton's trial testimony *and* his communications with Mr. Page's defense counsel constituted protected speech within the meaning of *Connick* and *Pickering,* we must now determine whether Mr. Melton's actions played a causative role in his dismissal.

*a. Mr. Melton's trial testimony.*

■ Throughout the trial, defendants repeatedly denied that Mr. Melton's testimony in the Page trial was in any way related to his dismissal. However, Mr. Melton presented evidence, albeit circumstantial, that his testimony may have been a substantial or motivating factor in his dismissal. Specifically he introduced testimony by the only other police officer who testified at the Page trial. Like Mr. Melton, that individual too was subjected to an

---

11. The dissent's assertions notwithstanding, we are not creating a new rule nor are we increasing the quantum of proof which the government must carry. We merely recognize what we believe to be an obvious *Pickering* requirement that the government show *some* ascertainable damage to its functioning as a result of the challenged speech. *Accord Roth v. Veteran's Admin.,* 856 F.2d 1401, 1407 (9th Cir.1988); *Conner v. Reinhard,* 847 F.2d 384, 390 (7th Cir. 1988); *Zamboni v. Stamler,* 847 F.2d 73, 78 (3d Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988); *American Postal Workers Union v. Postal Service,* 830 F.2d 294, 303 n. 12 (D.C.Cir.1987). In our view the government cannot prevail in a *Pickering* balance by merely relying on *unsubstantiated* allegations of disruption. Some circuits appear to take the position that a reasonable belief that disruption will occur is sufficient, at least in some circumstances. *See, e.g., Matherne v. Wilson,* 851 F.2d 752, 761 n. 53 (5th Cir.1988); *Jurgensen v. Fairfax County,* 745 F.2d 868, 879 (4th Cir.1984); *Waters v. Chaffin,* 684 F.2d 833, 839 n. 12 (11th Cir.1982). None, however, accept purely speculative allegations. Here, the City made *no* showing of disruption or, for that matter, potential disruption; only a bald assertion that Mr. Melton's actions in communicating with Page's counsel implicated the City's confidentiality interests.

12. Because of the facts of this case, we treat the two steps of the *Mt. Healthy* inquiry together, although analytically they are distinct.

Internal Affairs investigation shortly after his testimony. Eventually the other officer chose involuntary retirement rather than risk losing his retirement benefits if he were fired. From this evidence the jury *could* have determined that Mr. Melton's trial testimony was indeed a substantial or motivating factor in his dismissal, notwithstanding defendants' disavowal of that fact.

As to the second *Mt. Healthy* prong, defendants claim that the trial testimony was not the basis for the disciplinary action taken against Mr. Melton. Their consistent position has been that Mr. Melton was dismissed for his communication with Mr. Page's defense counsel.

### b. Mr. Melton's communication with defense counsel.

Not only did Mr. Melton make a substantial showing that his dismissal was in fact a result of his communication with Mr. Page's counsel, defendants readily admitted that fact. The jury had ample evidence on which to find that those actions were the motivating factor in plaintiff's discharge.

### c. The jury instruction.

■ In its First Amendment instruction the court improperly combined the two bases for potential liability: plaintiff's trial testimony and his communications with counsel.[13]

■ Additionally, while the jury instruction addressed the first prong of the *Mt. Healthy* inquiry—whether plaintiff had shown that his protected speech was the substantial or motivating factor in the dismissal—the court never informed the jury

as to the defendants' burden of rebuttal under *Mt. Healthy*.

■ We find we cannot affirm the jury's verdict against the individual defendants on the First Amendment claim because the errors in the instruction leave us "uncertain as to the actual ground on which the jury's decision rested." *Zant v. Stephens*, 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983). Under *Zant*, "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Id; see also Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305 (1962). Because we determine herein that the individual defendants are qualifiedly immune under *Harlow* if the dismissal was for Mr. Melton's communications with Mr. Page's defense counsel, *see* discussion *infra* at 728–30, that ground would be an insufficient basis for a verdict against them.[14] Consequently, we reverse the jury verdict on the First Amendment claim and remand for a new trial on the issue of whether Mr. Melton's trial testimony was a substantial motivating factor in his discharge.

### B. Procedural due process claims.

Mr. Melton alleged at trial that the City deprived him of two property interests without due process of law: (1) a property interest in his employment as a lieutenant in the Oklahoma City Police Department, and (2) a property interest in his status as a retired police officer. Mr. Melton also alleged that the City deprived him of liberty

---

**13.** The jury instruction on the First Amendment claim states in pertinent part:

In order to prevail upon his civil rights claim against the defendants for a violation of his First Amendment right to freedom of speech, plaintiff must establish the following elements by a preponderance of the evidence: FIRST: That his actions in connection with the tape recording and/or in appearing as a witness in a federal proceeding were constitutionally protected; and,

SECOND: That the exercise of his constitutional right to freedom of speech was a moti-

vating factor in the defendant City's decision to terminate his employment.

Brief of Defendant/Appellant, Jury Instruction No. 5, First Amendment Claim, Appendix at 7.

**14.** Either basis of liability submitted to the jury is adequate to impose liability on the City for the First Amendment claim. Consequently, we can affirm the jury's verdict notwithstanding the failure to separate the two bases in the instruction. *See* discussion of municipal liability *infra* at 723–25.

without due process of law by publicly disseminating stigmatizing charges in connection with his dismissal.

### 1. Deprivation of property.

 The City raises three issues on appeal concerning Mr. Melton's procedural due process claim arising out of his property interest in continued employment:[15] (1) that the court erred in denying defendants' motion for a directed verdict; (2) that the court erred in instructing the jury that due process requires that a person deprived of a property interest in his continued employment with the City of Oklahoma City is entitled to a pre-termination hearing before an impartial tribunal, reasonable notice and an opportunity to be heard; and (3) that the court erred in excluding evidence of available *post*-termination procedures.

We first address whether the trial court erred in denying the defendants' motion for directed verdict on the procedural due process claim arising out of his property interest in continued employment. The standard of review for the denial of a motion for directed verdict is the same standard used by the trial court to test the original motion, *Swearngin v. Sears Roebuck & Co.*, 376 F.2d 637, 639 (10th Cir.1967): Viewing the evidence and all inferences to be drawn therefrom in the light most favorable to the opponent of the motion, a directed verdict is proper only if "the evidence points but one way and is susceptible to no reasonable inferences which may sustain the position of the party against whom the motion is made." *Symons v. Mueller Co.*, 493 F.2d 972, 976 (10th Cir.1974).

Both parties agree that the Supreme Court's decision in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), governs the determination of what process is due before the state may deprive a person of an existing property interest.[16] The Supreme Court held that *before* "a tenured public employee" can be discharged, he "is entitled to oral or written notice of the charges against him, an explanation of the employ-

---

**15.** On appeal, the City challenges the court's determination that Mr. Melton had a property interest in his continued employment. It is well established that such a property interest may be created by a state statute, ordinance, or express or implied contract; and "the sufficiency of the claim of entitlement must be decided by reference to state law." *See Bishop v. Wood*, 426 U.S. 341, 344–45, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *see also Vinyard v. King*, 728 F.2d 428, 432 (10th Cir.1984). The City argues that the organic law of the City—the City Charter—provides that removal of a classified employee (such as Mr. Melton in this case) "shall be solely for the good of the service." This language has been authoritatively construed not to create a property interest in Oklahoma City employment. Thus, the City argues, neither the Police Department Policy Manual nor the City's Policies and Procedures Manual can supplant "the conditions of employment provided for by the Charter." Appellant–City's Brief in Chief, at 14.

Although compelling, the City's argument was not properly raised to the trial court nor preserved for appeal. *See* Fed.R.Civ.P. 51. Rule 51 specifically requires a party to object to an instruction before its submission to a jury. Our precedent uniformly holds that this court will "not review the propriety of a jury instruction unless counsel has timely objected to the instruction at trial." *See Ryder v. City of Topeka*, 814 F.2d 1412 (10th Cir.1987). Although this circuit recognizes a *narrow* plain error exception to Rule 51's otherwise unqualified language, "we have applied this exception rarely," *Glasscock v. Wilson Constructors, Inc.*, 627 F.2d 1065, 1068 (10th Cir.1980); *Prebble v. Brodrick*, 535 F.2d 605, 612 (10th Cir.1976), and only in the interest of justice. *Pridgin v. Wilkinson*, 296 F.2d 74, 76 (10th Cir.1961). Here, neither the City nor the individual defendants ever offered their own proposed set of jury instructions. In fact, the City raised the issue of the City Charter (as negating plaintiff's alleged entitlement to a property interest) for the first time on its Motion for Judgment N.O.V. Record, vol. 1, Motion for Judgment Notwithstanding the Verdict, at 3, ¶ 11. The City has never explained why it failed to present such important evidence to the trial court. Because the City did not raise this issue in its Answer, during its oral Motion for a Directed Verdict, nor as an objection to the jury instructions, neither the court nor the plaintiff was given timely opportunity to respond at trial with argument and relevant evidence. For these reasons we decline to review the issue on the basis of plain error. We conclude that on the record before it, the trial court did not err in ruling that Mr. Melton had a valid property interest in his continued employment.

**16.** *Loudermill* was decided by the Supreme Court after the events giving rise to this action took place. Nevertheless, the *Loudermill* decision interpreted case law extant at the time of Mr. Melton's discharge and on the issues before us does not mark a radical departure from prior precedent.

er's evidence, and an opportunity to present his side of the story." 470 U.S. at 546, 105 S.Ct. at 1495.

■ In light of the principles outlined in *Loudermill,* we conclude that Mr. Melton was not deprived of his property interest in continued employment without due process of law. Nearly one month before the disciplinary board was convened Mr. Melton was given written notice of the Internal Affairs investigation, the allegations against him, and the name of the party who made the allegations. Additionally, he was given five days' (three working days) written notice before the Review Board was actually convened. While this period may not have been as long as Mr. Melton desired, we believe that in this case it was adequate to prepare a defense in light of the earlier notice.[17]

The record plainly shows that Mr. Melton received due process before being deprived of his property interest in continued employment. We conclude that the trial court should have directed a verdict for defendants because the undisputed facts concerning notice and hearing clearly indicate that adequate process was given. Because we now direct a verdict for the defendants on this issue, we need not address their other grounds for appeal concerning Mr. Melton's property interest in continued employment. We reverse the jury verdict on this issue.

■ One additional problem plagues us. Mr. Melton originally alleged that he had been deprived of two property interests without due process of law: (1) his interest in continued full-time employment, and (2) his interest in his status as a retired police officer.[18] The problem is that which we faced earlier—that the trial court erroneously submitted both procedural due process determinations to the jury under one instruction. The jury rendered a general

verdict for Mr. Melton on the combined procedural due process issues. However, our reversal on the continued employment issue invalidates the jury's general verdict. Therefore, we must now address the disposition of the retirement status issue.

As we discussed previously, *supra* at 717–18, under *Zant* we cannot affirm a general verdict if one of the basis for liability is insufficient as a matter of law. Although unlikely, the jury might have predicated its finding of liability on the City's alleged deprivation of plaintiff's property interest in continued employment. In view of our conclusion that adequate process was given on that claim, it should not have been submitted to the jury and constitutes an "insufficient ground" for the jury's general verdict for Mr. Melton.

■ Normally, we should remand for a new trial on the issue whether Mr. Melton was deprived of his property interest in retirement status without due process of law. We find it unnecessary to remand on this issue, however, because we find that the evidence developed in the record establishes as a matter of law that Mr. Melton received no process before he was deprived of his property interest in his status as a retired police officer. Oklahoma law authorizes retired police officers to retain their status as "peace officers". Okla.Stat. tit. 11, § 50–125 (West Supp.1978). Additionally, the City's Police Department Operations Manual permits retiring officers with twenty years of service to retain their police badges. Operations Manual § 5.05. These provisions clearly created a property interest in Mr. Melton with respect to his status as a retired officer and in the benefits which accrue therefrom. Among these are the opportunity and common practice of accepting law enforcement-related employment and working those jobs in uniform. Notwithstanding these provisions, upon his dismissal Mr. Melton was asked to surren-

---

17. The record indicates that the collective bargaining agreement between the City and the Fraternal Order of Police requires a minimum of 48 hours' notice before a disciplinary board is convened. The hours' notice given in this case was at least double that minimum. We reserve judgment whether in all circumstances advance

notice of 48, or even 96, hours would be adequate; in *this* case we believe it is.

18. The City did not challenge the trial court's finding that Mr. Melton had a property interest in his status as a retired police officer. We do not disturb that finding on appeal.

der his badge. Shortly thereafter, the Chief informed him by letter that he was prohibited from representing himself in any way as a retired Oklahoma City police officer. Chief Gramling testified that the terms of the letter were intended to keep Mr. Melton from wearing his uniform—essentially foreclosing plaintiff from security-type employment.

■ At no time was Mr. Melton given any type of hearing in which to contest these actions. We conclude that there was no evidence from which reasonable jurors could have found for defendants on this issue. Consequently, we direct the trial court to enter a verdict for plaintiff on the procedural due process issue arising out of his status as a retired officer.

■ In sum, with respect to defendants' liability on Mr. Melton's deprivation of property claims, the trial court shall direct a verdict for defendants on the continued employment claim and direct a verdict for plaintiff on the retirement status claim. However, plaintiff's verdict shall be entered solely against Chief Gramling.[19] We remand for a new trial on two issues: (1) the damages to be assessed against Chief Gramling, and (2) the liability of the City for Chief Gramling's actions. The trial court must determine as a matter of law if Chief Gramling acted as a "final policymaker" or if his actions were ratified by a "final policymaker" before it submits the question of damages against the City to the jury. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), *and* discussion *infra.*

2. Deprivation of liberty.

The City makes four arguments on appeal in challenging its liability under Mr. Melton's liberty interest claim: (1) that the court erred in instructing the jury that an individual's liberty may be deprived when termination is accompanied by public dis-

semination of the *charges* against the employee, rather than the *reasons for dismissal;* (2) that the court erred in instructing the jury that when a person is deprived of liberty, due process requires a pre-termination hearing with right to counsel, and right to confront and cross-examine witnesses; (3) that the court erred in failing to instruct the jury that the disseminated information must be *false* as well as stigmatizing; and (4) that there was insufficient evidence to support the jury's verdict because plaintiff did not show he was damaged as a result of the claimed violation of the liberty interest.

### a. Dissemination of the charges.

The City claims that any alleged damage to Mr. Melton's reputation arising from the dissemination in the news media of the perjury charges did not implicate any liberty interest because the damage must be proximately connected with the termination of the employment. *See Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed. 2d 405 (1976). Therefore, the damage, if any, must stem from dissemination of the *reasons* for dismissal, and not merely the dissemination of the original charges alone. The City argues that the sole reason for Mr. Melton's dismissal was violation of the Police Code of Ethics. Since the Review Board never addressed the perjury charge, the argument goes, that charge was not a reason for dismissal. Therefore, the City did not impair Mr. Melton's liberty interest.

■ The crucial focus of any liberty interest inquiry must be the *stigmatization* which results from the publication of false and damaging information, regardless of whether it involves dissemination of "charges" or "reasons for dismissal". It is disingenuous to argue that one can stigmatize by publishing charges of this nature and then dismiss the employee on other

---

**19.** The trial court not only erred in combining the two deprivation of property issues under one jury instruction but also erred by failing to limit its application to Chief Gramling and the City in the retirement status determination. The other individual defendants played no part in the deprivation of Mr. Melton's property in-

terest in his retirement status. Therefore, we dismiss that claim with respect to the other individual defendants.

Under this claim, Chief Gramling is not entitled to qualified immunity. See discussion *infra* at 730–31.

grounds and claim no impairment to the liberty interest because "charges" are not "reasons for dismissal". In either case, the plaintiff's liberty interest in his good name and reputation has been impaired. We hold that where all other elements are met, the publication of "charges" which stigmatize can give rise to a claim that plaintiff's liberty interest has been impaired.

■ Despite the language in some of our opinions concerning the dissemination of the *reasons* for dismissal as an element of the liberty interest claim, *see e.g., Miller v. City of Mission,* 705 F.2d 368, 373 (10th Cir.1983), we believe our holding today is not inconsistent with the premise which underlies our previous opinions on this subject—that is, concern with protecting the good name and reputation of individuals from unlawful action which impairs an established right to employment. *See Paul v. Davis,* 424 U.S. at 708–09, 96 S.Ct. at 1164. In *McGhee v. Draper,* 639 F.2d 639 (10th Cir.1981), we demonstrated our concern with and focus on actual stigmatization. In *McGhee,* the employer circulated charges of immorality but never formally charged the employee with these incidents. Under the circumstances of that case, we stated:

> The requirement of *Paul v. Davis* that reputational harm be entangled with "some more tangible interests" is thus met when a terminated or non-renewed § 1983 plaintiff can show that the termination at least aggravated his stigmatization. We do not mean to imply that this is a heavy burden for a plaintiff. Any termination occurring in an atmosphere where the plaintiff's reputation is at issue should be sufficient to meet *Paul*'s entanglement requirement. It should be the *state's* burden to show that termination in such a context is so removed from plaintiff's reputational concern that it in no way impacted upon it.

*Id.* at 643 n. 2 (emphasis in original). Therefore, the circulation of the charges, coupled with the discharge, was sufficient to establish a liberty interest. *See also McGhee v. Draper,* 564 F.2d 902 (10th Cir.

1977). We conclude that in this case, as in *McGhee,* the dissemination of the charges coupled with dismissal was enough to establish a liberty interest which could not be deprived without due process of law. Therefore, the court's instruction in this regard was not erroneous.

### b. *Right to confront and cross-examine.*

■ "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). This requirement is applicable as well when a plaintiff alleges a deprivation of liberty without due process of law. *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The opportunity to be heard at a meaningful time and in a meaningful manner includes (1) an impartial tribunal; (2) notice of the charges within a reasonable time before the hearing; and (3) absent emergency circumstances, a *pre-termination* hearing. *Miller v. City of Mission, Kansas,* 705 F.2d 368, 372 (10th Cir. 1983). In *Walker v. United States,* 744 F.2d 67, 70 (10th Cir.1984), we recognized that "[w]hile not necessary in every case, 'procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood,'" (quoting *Willner v. Committee On Character,* 373 U.S. 96, 103, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224 (1963)).

Defendant Carl Smith informed Mr. Melton that he was being investigated, *inter alia,* because of accusations of perjury, both in a sworn affidavit and at trial. These charges were widely circulated in the media, due in part to defendant McBride's statements to the press confirming that Mr. Melton was under investigation and the nature of the charges, including perjury. Approximately three weeks later Mr. Melton was given three working-days' notice to appear at a meeting of the Disciplinary Review Board, and was told that "[y]our appearance before this board

is as a result of the Departmental Internal Affairs investigation."

It is clear that plaintiff (and probably the public) understood that the Review Board would address both charges and provide Mr. Melton the opportunity to refute them. Yet, on the very morning of the hearing, Mr. Melton was informed that he would not be allowed to address the perjury charge and that the Board would not consider the issue in its deliberations. Given the expectations created by the publicity concerning the perjury charge and the generalized nature of the stated reason for dismissal (violation of the Police Code of Ethics), it is reasonable to conclude that the public may have been left with the impression that Mr. Melton's dismissal was based in part upon the perjury charge.

■ Here, as in *Walker*, the employee's honesty and integrity were definitely called into question. The fact that the Board did not address the perjury issue in recommending his dismissal only compounded the problem because its refusal effectively precluded Mr. Melton from receiving the necessary name-clearing hearing. In addition, we believe that the perjury allegation was of a serious enough nature that at his hearing Mr. Melton should have been given the right to confront and cross-examine those who charged him with dishonesty. Under these circumstances, we cannot say that the trial court erred in instructing the jury that Mr. Melton was entitled to confront and cross-examine his accusers.

#### c. Instruction as to falsity element.

■ The City also objects to the liberty interest instruction on the basis that the court failed to instruct the jury that the disseminated information had to be *false* as well as stigmatizing. *Asbill v. Housing Authority of the Choctaw Nation of Okla-*homa, 726 F.2d 1499 (10th Cir.1984). This objection was not properly made before the jury instructions were read to the jury as required by Rule 51, Fed.R.Civ.P.[20] As a result, the matter was not properly preserved for appeal. We decline to reach it for that reason and because, in our view, no "plain error" was made.[21]

#### d. Sufficiency of the evidence to support the jury verdict: Evidence of economic damage.

As a final matter, the City claims that the jury verdict cannot stand because plaintiff did not show he was damaged as a result of the violation of his liberty interest.[22] While the City did not object to the jury instruction on this ground, nor raise this argument as a direct point of appeal, it is briefly discussed for the first time in the City's brief on appeal in the last two paragraphs of a related objection. *See* City's Brief in Chief, at 31–32.

■ The essence of the City's argument is that plaintiff failed to present evidence "that he was foreclosed from employment as a policeman because the reasons for his discharge." *Id.* at 32. The City misapprehends the legal and factual bases for Mr. Melton's liberty claim. In *Paul v. Davis* the Supreme Court established that damage to reputation *alone* did not create a protectable liberty interest. Rather, there had to be a published stigmatizing statement *and* an attendant change in the individual's legal status, such as the "accompanying loss of government employment." 424 U.S. at 706, 710, 96 S.Ct. at 1163, 1165. Here there has clearly been the publication of a defamatory and stigmatizing statement accompanied by the loss of Mr. Melton's government employment, all without the opportunity for a name-clearing hear-

---

**20.** See *supra* note 15.

**21.** We note that all along Mr. Melton has denied that he perjured himself in any way, and the evidence indicated that the City's own investigators declined to pursue this charge. Thus, while "falsity" as an express element of the liberty claim was not outlined in the jury instruction, we believe the matter was clearly before the jury.

**22.** In reviewing the sufficiency of the evidence underlying a civil jury verdict, this court's review is "limited to the inquiry whether the record contains substantial evidence to support the jury's ... conclusion, viewing the evidence in the light most favorable to the prevailing party." *Kitchens v. Bryan County Nat'l Bank,* 825 F.2d 248, 251 (10th Cir.1987).

ing. In addition, Mr. Melton also presented evidence that his options for future law enforcement-related employment (*e.g.* in the private security field) would likely be curtailed because of actions by the Police Chief which were expressly designed to accomplish that objective.[23] On this record we believe that Mr. Melton adequately stated a liberty interest under *Paul v. Davis.*

The dissent argues that the trial court committed "plain error" in its instruction on the liberty interest. *See post* at 742. However, the trial court's instruction is almost a direct restatement of our language in *Miller v. City of Mission,* 705 F.2d at 373, the only change being the substitution of the term "charges" for the *Miller* language on "reasons for dismissal." We have already discussed our views on this substitution, concluding that the change was appropriate. *See supra* at 719–720. Where the trial court has directly tracked our own language in its instruction, we cannot say this constitutes plain error.

## III. MUNICIPAL LIABILITY

### A. *Liability.*

The preceding discussion establishes that Mr. Melton suffered at least two constitutional deprivations as a result of his dismissal from city employment. The next inquiry is whether, in light of the Supreme Court's decision in *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the unconstitutional action was taken pursuant to municipal policy sufficient to impose section 1983 liability upon Oklahoma City.

In *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court recognized that municipalities could be subjected to section 1983 liability if a deprivation of a federally protected right was caused by action taken "pursuant to official municipal policy of some nature...." *Id.* at 691, 98 S.Ct. at 2036. Thus, "when execution of a government's policy or cus-

tom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy inflicts the injury ... the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037.

Subsequently, in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court examined the circumstances under which a decision by municipal policymakers on a single occasion could nevertheless satisfy the "official policy" requirement of *Monell.* The *Pembaur* Court noted,

> a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.

475 U.S. at 481, 106 S.Ct. at 1299 (footnote omitted). The touchstone for determining "official policy" is "distinguish[ing] acts of the *municipality* from acts of *employees* of the municipality, and thereby mak[ing] clear that municipal liability is limited to action for which the municipality is actually responsible." *Id.* at 479–80, 106 S.Ct. at 1298–99 (emphasis in original). The Court equated municipal responsibility with the actions of a "final policymaker": "[M]unicipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483–84, 106 S.Ct. at 1299–1300.

---

**23.** *See* discussion *supra* concerning Mr. Melton's property interest in his status as a retired police officer.

The Court's recent decision in *Praprotnik* further defines the circumstances under which section 1983 liability will be imposed upon municipalities. A plurality of the Court held that a municipality can only be liable under section 1983 if the final policymaker, as identified by statute, is the one who takes the unconstitutional action. Moreover, in identifying "final" policymakers, courts must turn to state laws and local ordinances or regulations to determine where the statutory law places the responsibility for making law or setting policy in a particular area. The *Praprotnik* Court emphasized that this determination is a question of law for the courts, not the jury.

Despite its "final policymaker" standard, the plurality in *Praprotnik* identified two situations where municipal liability nevertheless could be found even though the action is taken by an individual other than the "final policymaker": First, "egregious attempts by local government to insulate themselves from liability for unconstitutional policies" will be precluded if the plaintiff establishes "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Praprotnik*, 108 S.Ct. at 925–26 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)). Second, if

"a subordinate's position is subject to review by the municipality's authorized policymakers, ... [and] the authorized policymakers approve a subordinate's decision and the basis for it, their ratification [will] be chargeable to the municipality...." 108 S.Ct. at 926.

■ In applying these principles to the present case, we start by noting that, as an issue of law, this court can examine and determine the liability of Oklahoma City under the standard and considerations outlined in *Praprotnik*. Even though *Praprotnik* was decided after this trial and the parties did not have an opportunity to address this issue, we take judicial notice of the City Charter in order to proceed with our *Praprotnik* analysis.[24] *See Mills v. Denver Tramway Corp.*, 155 F.2d 808, 812 (10th Cir.1946) (appellate court has discretion to take judicial notice on its own accord).[25] We have considered whether the record of this case provides a sufficient basis to make this determination. We have concluded that it does.

As *Praprotnik* instructs us, our analysis must begin with an examination of state law, including valid local ordinances and regulations, in order to find the "official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* 108 S.Ct. at 924–25. The City of Oklahoma

---

24. Section 3. The City Manager. The City Manager shall:
 (a) Be the Chief Administrative Officer of the City and shall have charge and supervision of all branches of the City service, except as otherwise in this Charter provided.
 ....
 (c) Appoint all officers and employees of The City of Oklahoma City except the elective officers and the officers whose election is vested in the Council by this Charter.
 (d) *Dismiss any officer or employee appointed by him whenever, in his judgment, the interests of the City service so require.*
 Additionally, art. III, § 1 of the Charter provides:
 Section 1. Appointments and Promotions. Appointments and promotions in the classified service of the City shall be made according to merit and fitness, and removals and demotions shall be made solely for the good of the service.

25. There seem to be two conflicting lines of cases in our circuit on the question of judicial notice of city ordinances. In *Allred v. Svarczkopf*, 573 F.2d 1146, 1151 (10th Cir.1978), we took judicial notice of the city ordinances of Roosevelt City, Utah, and in *Jackson v. Denver Producing & Refining Co.*, 96 F.2d 457, 460 (10th Cir.1938), we took judicial notice of the Oklahoma City Charter and its provisions. However, elsewhere we have stated that "[i]n our Circuit, municipal ordinances may not be judicially noticed...." *Ruhs v. Pacific Power & Light*, 671 F.2d 1268, 1273 (10th Cir.1982) (quoting *Dewell v. Lawson*, 489 F.2d 877, 879 (10th Cir.1974)). We believe that the better rule permits the appellate court to take judicial notice of matters "not subject to reasonable dispute in that [they are] ... capable of accurate and ready determination by resort to sources whose accuracy cannot ... reasonably be questioned." Fed.R.Evid. 201.

City is a chartered city under the laws of the State of Oklahoma, operating under a Council–Manager form of government.

██ The City Charter makes clear that the City Manager is the "final policymaking authority" over employment decisions affecting City personnel. This section 1983 action was precipitated by the firing of Mr. Melton by the Chief of Police upon the recommendation of the Disciplinary Review Board *and with the approval and concurrence of the City Manager.* The testimony indicated that Chief Gramling met with the City Manager and discussed the proposed dismissal of Mr. Melton. The City Manager expressly approved such dismissal. *See* record, vol. 14, Transcript of Proceedings, at 878–79. Under the facts of this case, we are convinced that the City Manager ratified the Chief's actions within the meaning of *Praprotnik.*

We have already held that Mr. Melton was fired for exercising his First Amendment rights. In the process, he was also denied his liberty interest without due process. We now hold that the firing was done pursuant to a "municipal policy" which was ratified by the "final policymaking authority" as identified by state statute and local ordinance. Consequently, Oklahoma City is liable in damages to Mr. Melton under section 1983 for the violation of his First Amendment rights and liberty interest without due process of law.[26] Our conclusion remains the same regardless of whether the jury predicated its finding of municipal liability on Mr. Melton's communication with Mr. Page's attorney, his testimony at trial, or both.

### B. *Damages.*

The City also challenges as excessive the damages awarded by the jury to Mr. Melton. Specifically, the City claims that (a) the verdict form permitted damage awards to be "stacked," resulting in an insupportable total judgment;[27] (b) the court erred in its instruction by failing to require the jury to consider Mr. Melton's service pension in determining damages; and (c) plaintiff did not establish an entitlement to damages under the liberty interest claim because he failed to seek suitable employment.

██ With respect to all of the City's contentions, we noted earlier that defendants had made no effort to submit their own proposed jury instructions.[28] In addition, the City did not request special interrogatories to accompany the jury verdict form. Moreover, they raised no objections at trial which are relevant to their present claims. Because no attempt was made to properly raise these issues at the trial level or to preserve these alleged errors for appeal, we decline to reach them.

It has been our circuit's long-held position that "absent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, preju-

---

**26.** While not conclusive, the internal investigation which led to the forced retirement of the other officer who testified at the Page trial suggests the possibility that the City may have had a pattern or practice of subjecting individuals to retaliatory action because of their exercise of protected speech. Under *Monell,* such a pattern might also be sufficient to show the existence of an unconstitutional municipal policy giving rise to section 1983 liability.

In this case Mr. Melton showed, via the former officer's testimony, that someone else had apparently experienced retaliatory action after testifying at the Page trial. *See* Record, vol. 11, Transcript of Proceedings, at 484–489. By contrast, in *Praprotnik* the plurality considered persuasive the fact that the plaintiff had never "attempt[ed] to prove that such retaliation was ever directed against anyone other than himself." 108 S.Ct. 926.

This case differs from many section 1983 actions because here the City does not disavow the actions of some of its employees as not being in keeping with official policy. Rather, it is the City's official litigation posture that it can discipline officers who disclose information gained in the process of being questioned as potential witnesses—without regard to whether or not the officers are acting in an official capacity. The City in effect argues that it *is* its policy to act in this manner. Thus, if Mr. Melton's actions were to be replicated by another officer, the City claims that the individual would be properly subject to discipline, including dismissal.

**27.** A review of the verdict form makes abundantly clear that the jury weighed each of the claims separately and gave them an individualized valuation. We find no merit in defendants' argument that the damages were "stacked".

**28.** *See supra,* note 15.

dice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152, 1168 (10th Cir.1981) (en banc), *cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983) (and cases cited therein). We do not find the award to be "so excessive as to shock the judicial conscience" nor do we consider the award to be a result of passion or prejudice. The damage award against the City stands.

## IV. IMMUNITY

We turn next to the issue of the individual defendants' liability for damages under section 1983. The jury awarded a total of $906,500 in actual damages and $28,200 in punitive damages against all but one of the individual defendants. The district court thereafter granted the defendants' Motion for Judgment N.O.V. on the issue of punitive damages.

The individual defendants challenge the jury's assessment of damages against them on two theories: First, that the suit was brought against them in their official capacity and therefore no individual liability should accrue. Second, if they are otherwise personally liable, they should be shielded by the qualified immunity recognized in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

█ The applicability of immunity defenses is a question of law. *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Consequently, this issue should not have been submitted

to the jury. To the extent that the trial court may have erred in questions of law, this court reviews those issues *de novo. In re Ruti–Sweetwater, Inc.,* 836 F.2d 1263, 1266 (10th Cir.1988). As a matter of law, we find that this was not solely an "official capacity" action.

### A. *Official-capacity.*

█ In *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the Court stated that where the complaint does not clearly specify whether officials are sued personally or in their official capacity, courts must look to "the course of proceedings" to determine the type of liability sought to be imposed. *Id.* at 167 n. 14, 105 S.Ct. at 3106 n. 14 (quoting *Brandon v. Holt,* 469 U.S. 464, 465, 105 S.Ct. 873, 874, 83 L.Ed.2d 878 (1985)). This is one of those cases where ambiguous pleadings have required this court to closely examine the "course of proceedings" in order to determine the basis on which this suit was brought and litigated.[29] We conclude that while the action was brought against the individual defendants primarily for their actions in an official capacity, possible personal liability was also contemplated by all the parties at the time of trial.[30] Consequently, we reject defendants' claim of no personal liability on the basis that this was solely an official-capacity suit.[31]

We find support for our conclusion from the record of the proceedings at the time the jury was receiving its instructions. Initially the court instructed the jury that "[u]nder the pleadings and the facts in this case, you must find against Oklahoma City

---

**29.** Here the caption of the pleadings did not specify on what basis the individual defendants were being sued, and the language of the complaint was ambiguous.

**30.** In *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985), the Supreme Court summarized the differences between the two types of suits:

Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is

an agent." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n. 55 [98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611] (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity. (citations omitted) (emphasis in original).

**31.** We do not reach the issue of how the Supreme Court's decisions in *Pembaur* and *Praprotnik* would affect this case if it were solely an official-capacity action.

anytime you find against any one of the individuals, because they were acting for the City, except punitive damages." Record, vol. 14, Transcript of Proceedings, at 994. The court characterized this instruction as one resulting from a "stipulation" by the parties. *Id.* at 997. However, defendants' counsel, who was representing both the City and the individual defendants, objected to the court's representation. In response to counsel's objection the court corrected its instruction, telling the jury to "judge Oklahoma City just like you would the individuals, whether it's liable or not liable, on that claim." *Id.* at 998. Counsel's objection effectively disavowed the City's automatic liability if the jury found against the individual defendants— the expected outcome if this were solely an official-capacity suit. Counsel's action can only be explained on the basis that he was proceeding under an assumption that the case also involved issues of personal capacity.[32]

### B. *Qualified immunity of individual defendants.*

With respect to their second rationale for exoneration from damages, the individual defendants object to the jury instruction concerning good faith immunity on the basis that (1) the court applied an improper standard, and (2) that the instruction "presume[d] 'established law' without informing the jury as to what the law is." Record, vol. 14, at 1004.[33]

The qualified immunity of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The key to the inquiry is the "objective reasonableness" of the official's conduct in light of the legal rules that were "clearly established" at the time the action was taken. *Id.*

Reliance on this qualified immunity standard should "permit the resolution of many insubstantial claims on summary judgment." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. However, this does not prevent defendants from raising the issue in the absence of a prior summary judgment motion. *See Rakovich v. Wade,* 850 F.2d 1180, 1204 (7th Cir.) (en banc), *cert. denied,* — U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

1. Qualified immunity inquiry in a First Amendment context.

Determining whether a public employee has been discharged in violation of his First Amendment rights requires a case-by-case analysis: initially to determine if the speech was on a matter of public concern, and, secondly, to determine how the balancing of competing interests should be resolved in light of particular facts. *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). We must now determine how the individualized nature of this inquiry can be reconciled with *Harlow*'s requirement that the law be "clearly established" before qualified immunity can be defeated.

The Fifth Circuit recently addressed this issue in *Noyola v. Texas Department of Human Resources,* 846 F.2d 1021 (5th Cir.

---

**32.** In addition, at the close of plaintiff's case, defendants' counsel moved to dismiss with regard to the individual defendants on the basis of a good faith defense. It is obvious that counsel was defending this case as *both* a personal-capacity and an official-capacity action.

**33.** Appellants properly preserved the issue on appeal by raising the affirmative defense of good faith immunity at various stages of the proceedings. Initially the issue was raised in defendants' Answer and in the Pre–Trial Order. Counsel for the individual defendants also raised the defense in oral Motions for Directed Verdict at the close of plaintiff's case and then again at the close of all the evidence. Finally, defendants objected to the jury instruction on good faith immunity.

In this appeal most of the individual defendants also claim judicial and quasi-judicial immunity. However, this issue was not raised until defendants' Motion for Judgment N.O.V. We conclude that this issue was not properly preserved and we decline to reach it. *See* Fed. R.Civ.P. 51.

1988). In *Noyola*, a former employee of the Texas Department of Human Resources sued officials of the Department, claiming that he was fired for exercising his First Amendment right of freedom of speech. The Fifth Circuit held that the speech at issue was not protected. Even assuming *arguendo* that it was protected, the officials were entitled to qualified immunity because the balancing process required by this type of case showed that "neither the 'contours' of [the employee's] rights were so clearly outlined nor was the 'unlawfulness' of terminating [him] so 'apparent' that [the officials] should forfeit their qualified immunity." *Id.* at 1026 (citing *Anderson*, 107 S.Ct. at 3039).

The Seventh Circuit has also recognized that:

> [T]here is one type of constitutional rule, namely that involving the balancing of competing interests, for which the standard may be clearly established, but its application is so fact dependent that the "law" can rarely be considered "clearly established." ... With *Harlow*'s elimination of the inquiry into the actual motivations of the official, qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required.

*Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986) (footnote omitted) (cited with approval in *Rakovich*, 850 F.2d at 1213). In *Rakovich*, the complainant sued a police chief and police officers under section 1983 claiming that they had launched an investigation of him in retaliation for comments protected by the First Amendment. The Seventh Circuit held that the plaintiff had not shown that defendants retaliated against him for his protected speech. The court alternatively concluded that the officials had qualified immunity for conduct which, at the time of the alleged violation, did not violate clearly established law.

In *Roth v. Veteran's Administration*, 856 F.2d 1401 (9th Cir.1988), the Ninth Circuit rejected the *Benson* analysis on which *Rakovich* relied. *Roth* involved a suit by a physician and former employee of the Veteran's Administration medical center in San Francisco. Plaintiff sued his former superiors in their individual capacities, charging that they fired him in retaliation for his activities as a "whistleblower" in exposing "wastefulness, mismanagement, unethical conduct, violations of regulations, and incompetence...." *Id.* at 1403.[34]

The Ninth Circuit held that Roth's speech was on a matter of public concern, 856 F.2d at 1406, and that factual disputes concerning the disruptive nature of Roth's statements precluded summary disposition. Defendants relied on the rationale of the Seventh Circuit's decision in *Benson* in arguing their entitlement to qualified immunity. The Ninth Circuit rejected that argument stating:

> If we accepted defendants' argument for a broader reading of *Benson*, we essentially would be holding that public employees can never maintain [an] action alleging retaliation for exercise of their first amendment rights because adjudicating these claims requires particularized balancing. We decline to adopt a rule that would effectively eviscerate whistleblower protection for public employees.

*Id.* The court noted that it and others had found the law to be established with sufficient clarity to deny defendants the protection of qualified immunity at the summary judgment stage in cases comparable to Roth's. *Id.* at 1408.

We understand the concerns which prompted the Ninth Circuit's determination not to give *Benson* "a broader reading." These cases illustrate how difficult it is to apply *Harlow* in the setting of *Pickering* balancing. A simple black letter rule is not possible. What is clear is that

---

**34.** Although this case involves an action against federal, rather than state officials under § 1983, the actions are analogous for our purposes. *See Bivens v. Six Unknown Named Agents of the Fed.* *Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (violation of constitutional rights actionable against federal officials).

*Harlow* places the presumption in favor of immunity for public officials acting in their individual capacities.[35] *Harlow* is intended as a shield against liability but cannot become an insuperable barrier; therefore, public officials lose immunity in the face of clearly established law. However, because a rule of law determined by a balancing of interests is inevitably difficult to clearly anticipate, it follows that where *Pickering* balancing is required, the law is less likely to be well established than in other cases. We believe that except for case-by-case analysis and application, the rule cannot be better stated than in *Harlow* itself with careful consideration of its underlying principles.

In some circumstances, the fact-specific nature of the *Pickering* balancing may preclude a determination of "clearly established law," thereby giving rise to qualified immunity under *Harlow*. This is most likely to occur in situations where supervisors, in a reasonable and good-faith exercise of their duties, discipline employees without the direction that would come through analogous cases.[36] We believe that the approach we adopt gives proper consideration to the concerns which prompted the Supreme Court to recognize qualified immuni-

ty, while it protects individuals from unprincipled behavior by a public employee's supervisors acting under color of law.

■ We now turn to the application of those principles to the facts before us. "Qualified immunity analysis requires the court to consider the operation of the rule in the context of 'the circumstances with which [the official] was confronted.'" *Giacalone v. Abrams*, 850 F.2d 79, 85 (2d Cir.1988) (quoting *Anderson*, 107 S.Ct. at 3039).[37] Consequently, our inquiry is: At the time these events took place, was the protected nature of Mr. Melton's speech sufficiently clear that defendants should have been reasonably on notice that the City's interest in its disciplinary rule would not survive a balancing inquiry?

■ This case presents an extremely close question as to whether the individual defendants are entitled to qualified immunity. Defendants should have been clearly on notice that Mr. Melton's trial testimony constituted protected speech under the First Amendment. *See Smith v. Hightower*, 693 F.2d 359 (5th Cir.1982). In our mind, a reasonable official would have been on notice that the City's interest in the effective and efficient functioning of its

---

**35.** *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law…. [If officials] of reasonable competence could disagree …, immunity should be recognized.").

**36.** However, to the extent that courts in analogous (but not necessarily factually identical) cases have struck the necessary balance, government officials will be deemed "on notice" that their actions will be measured according to clearly established law and qualified immunity may not be available to them.

We also emphasize that our decision *does not* mean that only binding precedent will clearly establish a right. We assume that counsel for government entities remain abreast of the decisional law and periodically update responsible government officials so that their actions will be informed by, and will comport with, the law.

**37.** The Supreme Court has warned that in determining whether the law was clearly established, a court should be careful not to test the rule of law at such a level of generality as to render unavailable the defense of qualified immunity.

*Anderson v. Creighton*, 107 S.Ct. at 3038–39. Too general a formulation would

convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages."

*Id.* 107 S.Ct. at 3039 (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed. 2d 139 (1984)). Conversely, structuring the inquiry too narrowly "would render the defense available to all public officials except in those rare cases in which a precedential case existed which was 'on all fours' factually with the case at bar." *Dartlands v. Metropolitan Dade County*, 681 F.Supp. 1539, 1546 (S.D.Fla.1988). Thus, in phrasing the inquiry, courts must be careful to reach the proper level of concreteness without overly limiting the factual context.

enterprise *cannot* outweigh an employee's right (and a citizen's duty) to testify truthfully at trial. *See Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096, 1100 (5th Cir.1987) ("To allow a government employer to retaliate ... against an employee's unfavorable trial testimony would undermine the ability of the witness to speak truthfully without fear of reprisal.") Therefore, under *Harlow* no immunity could exist for retaliatory action based on Mr. Melton's trial testimony.

■■■ We conclude, however, that defendants do enjoy qualified immunity to the extent that their liability is predicated on their recommendation of dismissal for Mr. Melton's *communications with defense counsel.* We have concluded that under *Pickering* the balance to be struck between the City's interest in smooth intergovernmental relations is outweighed by Mr. Melton's interest in speaking to defense counsel. However, the balancing of these competing interests would not have been so clear to a reasonable official under these circumstances that we can say it constituted "clearly established law" under *Harlow.* We cannot expect individual defendants to have understood at the time of Mr. Melton's discharge that it was unconstitutional to fire Mr. Melton for his communications with Mr. Page's counsel, particularly in view of their belief that this discussion constituted a breach of confidentiality.

We have ordered a new trial on Mr. Melton's claim that his trial testimony was a substantial or motivating factor in his dismissal from the Oklahoma City Police Department. If on retrial the jury so finds, the individual defendants *will not* be shielded by *Harlow* from personal liability for any damages which may be awarded on that basis. Because *Harlow* immunity shields the individual defendants from the

alternative basis of First Amendment liability (Mr. Melton's communications with defense counsel), no purpose would be served by a retrial on that basis since damages could not be collected.

2. Qualified immunity and deprivation of a property interest without due process of law.

We now examine whether Chief Gramling's deprivation of Mr. Melton's property interest in his status as a retired officer is protected by qualified immunity. This is a question of law which this court can address.[38] Our inquiry is whether it was clearly established law at the time the Chief acted that Okla.Stat. tit. 11 § 50–125 created a property interest that could not be deprived without affording Mr. Melton the right to be heard.

The right to due process whenever a property interest is impaired was established over fifteen years ago by the Supreme Court in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In *Sindermann*, the Court recognized that " 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit...." *Id.* at 601, 92 S.Ct. at 2699 (citation omitted). Here, a state statute, Okla. Stat. tit. 11, § 50–125, and the police department's own Operations Manual, outlined the basis of Mr. Melton's entitlement.[39]

■■■ Chief Gramling argues that he relied in good faith on the advice of municipal

**38.** For reasons of judicial economy it makes sense for us to address this issue before a new trial is held; a determination by this court that qualified immunity is applicable would preclude Chief Gramling from the need to litigate the question of personal liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (Qualified immunity is an "entitlement not to stand trial or face the other burdens of litigation which is 'effectively lost if

a case is erroneously permitted to go to trial.' ") *See also Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (dispose of qualified immunity issue at summary judgment stage if possible).

**39.** As we stated earlier, Mr. Melton's property interest in his status as a retired officer was uncontested at trial and unchallenged on appeal.

counsel in sending his letter to Mr. Melton, and, therefore, he should be absolved of any personal liability for the consequences of his actions. While superficially attractive, this argument proves too much. Adopting the proffered position would immunize officials from liability via the simple expedient of consulting counsel. In *Harlow*, the Supreme Court sought to protect officials in the good faith exercise of discretion in areas of the law which are not clearly charted. However, where the law is clearly established, there is no justification for excusing individuals from liability for their actions. In sum, officials are presumed to know and abide by clearly established law. When their actions are otherwise, their claims of qualified immunity will fail.

 We conclude that Chief Gramling knew or should have known that under Oklahoma statute Mr. Melton had a property interest in his status as a retired police officer. According to the statute, it was clearly within the discretion of municipal officials to approve or deny Mr. Melton the right to "keep and bear firearms." However, the Chief's letter was designed to, and actually did, reach beyond permissible limits by forbidding Mr. Melton from representing himself in any way as a retired member of the Oklahoma City police force. Chief Gramling deprived Mr. Melton of this property interest without notice or opportunity to respond. We hold that in so doing, Chief Gramling violated clearly established law and cannot claim the protection of qualified immunity on retrial.

3. Qualified immunity and deprivation of a liberty interest without due process of law.

We have long held that " '[t]he concept of liberty recognizes two particular interests of a public employee: 1) the protection of his good name, reputation, honor and integrity, and 2) his freedom to take advantage of other employment opportunities.' " *Weathers v. West Yuma County School Dist. R–J–1*, 530 F.2d 1335, 1338 (10th Cir. 1976) (quoting *Lipp v. Bd. of Educ.*, 470 F.2d 802 (7th Cir.1972)). If the dismissal of a government employee implicates a liberty interest, the employee is entitled to a name-clearing hearing. *Miller v. City of Mission*, 705 F.2d at 373. Under *Anderson v. Creighton*, we must determine if the circumstances in this case were such that "reasonable official[s] would understand that what [they are doing] violate[d] that right." 107 S.Ct. at 3039. Thus our inquiry is whether it was "clearly established law" in 1983 that the public dissemination of unsupported perjury allegations, followed by a discharge, created enough of a stigma that Mr. Melton was entitled to a name-clearing hearing.

 We conclude that the law in this area was clearly established, and that all but one of the individual defendants violated this right by failing to provide Mr. Melton with the opportunity to address that charge in an appropriate way. With the exception of defendant McBride,[40] each of the other individual defendants was in a position to ensure that Mr. Melton received a name-clearing hearing. Specifically, defendant Maxwell as Chair of the Disciplinary Review Board should not have prevented Mr. Melton from addressing the perjury issue. In addition, each Board member was in a position to bring to the Chair's attention the need to provide such an opportunity in light of the public dissemination of the perjury charges. As the highest authority in the police department, defendant Gramling should have made sure that Mr. Melton received due process in this area. We affirm the award of dam-

---

**40.** It is true that in his position as Public Information Officer Lieutenant McBride should be particularly sensitive to the potentially stigmatizing effect of the information he disseminates. Moreover, his actions arguably triggered the need for the name-clearing hearing. Nevertheless, it is clear that in a liberty-interest claim, liability accrues as a result of the failure to provide adequate procedural safeguards. Lieu-

tenant McBride was not a participant in the deliberations of the Review Board; he was not in a position to ensure the provision of a name-clearing hearing; nor was he involved in the decision to discharge without due process. Consequently, we conclude that Lieutenant McBride was not a proper defendant on the liberty-interest claim.

ages on the liberty interest claim as to all defendants except defendant McBride.

## V. APPEAL ON CROSS CLAIMS

Mr. Melton appeals the trial court's actions in (a) directing a verdict on his RICO claim, (b) instructing the jury concerning the section 1985 claim, and (c) striking the punitive damage awards.

### A. RICO.

We find no merit in Mr. Melton's claim that the trial court erred in its handling of the RICO claim. It is true that the trial court improperly intimated that RICO was inappropriate because the actions of the Oklahoma City Police Department could not be likened to a "gangster situation." In *United States v. Turkette*, 452 U.S. 576, 585, 101 S.Ct. 2524, 2529, 69 L.Ed.2d 246 (1981), the Supreme Court made clear that RICO "applies to both legitimate and illegitimate enterprises." However, we hold that in this case the trial court's misstatement constitutes harmless error. The plaintiff failed to establish the elements required for a RICO violation with respect to each defendant. Consequently, the district court properly refused to allow the RICO claim to go to the jury.

■■■ Mr. Melton alleged that defendants violated 18 U.S.C. § 1503, which prohibits actions in obstruction of justice. However, to establish this offense plaintiff must prove that each defendant had a specific intent to impede the administration of justice. *United States v. Carleo*, 576 F.2d 846 (10th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 152 (1978). We find no evidence in the record to support such an intent. In our view, neither the Internal Affairs investigation of Mr. Melton nor the convening of the Disciplinary Review Board was undertaken with the intent to obstruct justice. Although we have held that Mr. Melton's dismissal and

the circumstances attending it constituted a violation of his First Amendment and Due Process rights, that is a significantly different proposition from intentional interference with the administration of justice. We hold that the trial court did not err in granting a directed verdict on the RICO claim.

### B. *Section 1985 claim.*

The essence of plaintiff's objection is that the trial court refused to adopt the wording in plaintiff's proposed instruction. It is well established that although "'a party is, upon proper request, entitled to an instruction upon his theory of the case if there is evidence to support it, a party is not entitled to have the jury instructed in the particular language of its choice.'" *United States v. Stallings*, 810 F.2d 973, 977 (10th Cir.1987) (quoting *Wegerer v. First Commodity Corp.*, 744 F.2d 719, 723 (10th Cir.1984) (citations omitted)).

We have reviewed the instruction at issue and conclude that it was not erroneous as a matter of law. While the instruction may not have been as specific in its application of the law to the facts as plaintiff desired, the instruction correctly stated the law. We do not believe the instruction, as given, mislead or confused the jury. We also find no merit in plaintiff's contention that the trial court erred in failing to direct a verdict for plaintiff on the section 1985(2) claim.

### C. *Punitive damages.*

We have already held that, with some exceptions, the individual defendants are entitled to the qualified immunity protection provided by *Harlow*.[41] Since good faith immunity precludes liability for actual damages, we find no basis for a punitive damage award on the First Amendment claim. *Cf. Lavicky v. Burnett*, 758 F.2d 468, 477 (10th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 917

---

**41.** We have found that certain individual defendants are not qualifiedly immune for the violation of Mr. Melton's liberty interest. Chief Gramling is likewise not immune with respect to the issue of the plaintiff's property interest in his status as a retired officer. We have remand-

ed for a new trial on the basis of First Amendment liability. Depending on the outcome of the new trial, defendants may not be qualifiedly immune on the First Amendment-trial testimony claim.

(1986) (no punitive damage award where issue should not have been submitted to jury in the first place).

With respect to the property interest claim (retired officer status), we have held that only the City and Chief Gramling must face a new trial on this issue. Because the other individual defendants were not parties to the deprivation of plaintiff's property interest in his status as a retired officer, they, of course, cannot be liable for punitive damages.

■■■■ Liability for punitive damages can only be found, if at all, against Chief Gramling for the deprivation of plaintiff's property interest and against the individual defendants who contributed to the deprivation of Mr. Melton's liberty interest. Just because public officials make mistakes in judgment in the performance of their duties sufficient to subject them to liability for actual damages does not automatically create a basis for a punitive award. The standard for the award of punitive damages is whether defendants acted with ill will, desire to injure, reckless indifference, or malice. *Lavicky*, 758 F.2d at 477. Our review of the record does not show such malice, ill will, or reckless disregard for Mr. Melton's rights as to meet this standard. For example, it is clear that when Mr. Melton's reputation was stigmatized by dissemination of the perjury charges, defendants should have afforded him a name-clearing hearing. However, we do not discern any malice in the Review Board's refusal to address the perjury charge. If anything, it was probably an effort to not base disciplinary action on the unproven allegations of a third party.

Therefore, at most, the impairment of Mr. Melton's liberty interest arose from the officials' lack of familiarity with due process requirements. However, "[o]fficials cannot be held for punitive damages simply because they did not know the rules of conduct they should follow. Simple ignorance of the applicable legal rules, even arrogant ignorance, does not by itself indicate reckless or callous indifference to federally protected rights." *Lavicky*, 758 F.2d at 477. In light of the governing standard and the facts of this case, we hold that the trial court did not err in granting judgment n.o.v. on the issue of punitive damages.

## VI. ATTORNEY'S FEES

■■■■ Finally, we address defendant Carl Smith's claim that he is entitled to attorney's fees pursuant to 42 U.S.C. § 1988 (1982) as a prevailing defendant.

The Supreme Court has stated that "[a] prevailing defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." *Hensley v. Eckerhart*, 461 U.S. 424, 429 n. 2, 103 S.Ct. 1933, 1937 n. 2, 76 L.Ed.2d 40 (1983). The decision to award or deny attorney's fees lies within the sound discretion of the court. On appeal, review is subject to an abuse of discretion standard. *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir.1986).

Defendant Smith offers little more than conclusory statements in support of his claim that plaintiff's action against him was frivolous and maintained in bad faith. The sheer length of this opinion should suggest that the issues raised by plaintiff in his lawsuit were not frivolous. Moreover, on this record we cannot say that plaintiff's interest in maintaining the lawsuit against Lieutenant Smith was in any way based on intent to harass or embarrass the defendant. We hold that the district court did not abuse its discretion in denying Lieutenant Smith's request for attorney's fees.

## VII. SUMMARY

This case has raised a number of troublesome issues which have required detailed analysis. To assist the trial court's disposition on remand, we summarize our conclusions as follows:

1. Mr. Melton's speech-related activities were protected under the First Amendment, and his dismissal for the exercise of his constitutional right was unwarranted and improper. However, because the jury instruction on the First Amendment claim improperly combined two bases of liability

and did not include a full *Mt. Healthy* inquiry on Mr. Melton's claim that his trial testimony was a substantial or motivating factor in his dismissal, we reverse the jury verdict and remand for a new trial.

2. Mr. Melton was afforded adequate due process with respect to his property interest in continued employment.

3. Mr. Melton was *not* afforded *any* due process prior to the termination of his statutorily-created property interest in his status as a retired police officer.

4. Because the jury instruction on property interest-due process improperly combined two bases for liability, one of which was unsupported by the evidence, we reverse the jury verdict and remand for a new trial. On retrial the trial court must determine whether Oklahoma City is liable under *Praprotnik* for Chief Gramling's actions, and the jury must determine the damages to be assessed against Chief Gramling. The trial court shall direct a verdict for *defendants* on the property interest in continued employment claim. The trial court shall direct a verdict for *plaintiff* on the property interest in retirement status claim.

5. Mr. Melton was deprived of his liberty interest without due process of law, and the City as well as all of the individual defendants except for Lieutenants Smith and McBride are personally liable in damages to the plaintiff. The law with respect to liberty interest-due process *was* clearly established, so the individual defendants cannot be protected from personal liability under *Harlow*.

6. Mr. Melton's dismissal for his First Amendment-protected speech, and the violation of his liberty interest without due process, were unconstitutional actions taken pursuant to municipal policy or ratified by the final policymaking authority as identified by statute and ordinance. Consequently, the City of Oklahoma City is liable in damages to Mr. Melton on these two claims.

7. The jury verdict on actual damages was not excessive nor improper.

8. This action was *not* brought solely as an official capacity action, which would shield the individual defendants from personal liability. Even assuming that the parties initially litigated the case in that posture, defendants' counsel effectively disavowed the City's automatic liability under official capacity, thereby exposing the individual defendants to personal liability.

9. We hold that *Harlow* immunity protects the individual defendants from personal liability on the claim that Mr. Melton was discharged for his communications with Mr. Page's counsel.

10. If, in a new trial, the jury finds that Mr. Melton's *trial testimony* was a substantial or motivating factor in his dismissal, then they shall determine his damages and *Harlow* immunity will *not* protect the individual defendants.

11. On retrial, Chief Gramling will not be protected by good faith immunity on plaintiff's property interest claim with respect to his status as retired officer.

12. The trial court did not err in directing a verdict for defendants on Mr. Melton's RICO claim.

13. The trial court did not err in its instruction to the jury concerning the section 1985(2) claim.

14. The trial court did not err in granting judgment n.o.v. for defendants on the punitive damages issue.

15. The trial court did not abuse its discretion in denying defendant Smith's request for attorney's fees.

AFFIRMED in part, REVERSED in part, and REMANDED for a new trial on (1) the City's and Chief Gramling's liability on the deprivation of Mr. Melton's property interest (in his retired officer status) without due process of law, and (2) the individual defendant's liability under Mr. Melton's claim that his trial testimony was a substantial or motivating factor in his dismissal.

BALDOCK, Circuit Judge, concurring in part and dissenting in part.

On September 13, 1983, Police Chief Lloyd Gramling, with the approval of City

Manager Carl Johnson, relieved Lieutenant R.J. Melton of his duties with the Oklahoma City Police Department. Melton was terminated after nearly twenty-one years of loyal service for violating a portion of § 1.01 of the police department's operation manual: "Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty." Relying on the findings of an internal affairs investigation commenced August 1, 1983, a Disciplinary Review Board concluded that Melton improperly had provided a tape recording of a confidential communication between himself and an assistant U.S. attorney to defense counsel of Judge William Page. Judge Page, a friend of Melton for whom Melton testified at trial, was convicted of racketeering and extortion on July 29, 1983. *United States v. Page*, No. CR–83–73–R (W.D.Okla. filed April 6, 1983), *aff'd*, 808 F.2d 723 (10th Cir.), *cert. denied*, 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987).

Following his discharge, Melton instituted this suit on January 9, 1984, against Oklahoma City and various law enforcement officials connected with the incident, alleging (1) a deprivation of his free speech and due process rights in violation of 42 U.S.C. § 1983, (2) a conspiracy to retaliate against him for testifying on behalf of a defendant in a federal criminal proceeding as proscribed by 42 U.S.C. § 1985(2), and (3) a pattern of racketeering designed to impede the administration of justice in contravention of 18 U.S.C. §§ 1964 & 1503. On February 4, 1985, a jury rendered a general verdict for Melton in the amount of $1,272,000 on his free speech and due process claims, but returned a verdict in favor of the defendants on his conspiracy theory. The district court struck a $28,200 punitive damage award in Melton's favor and directed a verdict for the defendants on his racketeering charge. The motion for attorney's fees under 42 U.S.C. § 1988 of internal affairs investigator Carl Smith, the only defendant exonerated on each of Melton's allegations, was denied. These six consolidated appeals ensued.

The court has delivered a thorough opinion, sorting out the myriad of difficult questions involved, and I join in the court's disposition of the official-capacity immunity, racketeering, conspiracy, punitive damages, and attorney's fees issues contained in parts IV–A, V and VI. But much of the court's approach to the defendants' asserted liability under the free speech and due process provisions of our Constitution is overly broad, failing to find support in the record or binding precedent. The record certainly reveals a harsh treatment of Melton, seemingly unwarranted when his "misconduct" is weighed against his lengthy and unblemished service to the police force. But unfortunately, law and justice are not always coextensive. Consequently, the salient issue is not whether the firing of Melton was unfair, but whether the firing of Melton was contrary to law, and whether that violation of law reached constitutional dimensions.

I.

The court first undertakes an analysis of Melton's claim that the defendants deprived him of his first amendment right to freedom of speech when they allegedly discharged him on the basis of his (1) trial testimony in favor of Judge Page, and (2) disclosure of a communication with the government to Judge Page's defense counsel. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), established a three-prong test to determine whether a governmental entity's decision to discharge an employee contravenes the employee's first amendment guarantees. The employee must initially show as a matter of law that the speech at issue deserves constitutional protection. The court in this instance correctly points out that this inquiry involves two steps: Whether the speech constitutes a matter of public concern, and, if so, whether the employee's interest in making the statement outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563,

568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). If the speech is worthy of protection, the employee then has the burden of proving as a factual matter that the protected speech was a "motivating factor" in the detrimental employment decision. *Mt. Healthy*, 429 U.S. at 274, 97 S.Ct. at 569. Lastly, if the employee establishes his case, the employer must be given an opportunity to persuade the jury that it would have reached the same decision in the absence of the protected activity. *Id. See generally Koch v. City of Hutchinson*, 847 F.2d 1436, 1440 n. 11 (10th Cir.) (en banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).

### A.

Accepting the propriety of the court's conclusion that Melton's trial testimony was a matter of public concern which outweighed Oklahoma City's interest in the effective functioning of its police department, the record contains evidence insufficient for any reasonable jury to conclude that Melton's trial testimony was the "motivating factor" or cause for his discharge. The letter of September 13, 1983, from Police Chief Gramling to Melton concerning the reason for the discharge makes no reference to the trial testimony, but rather refers only to the tape recorded conversation Melton furnished Judge Page's defense. Gramling testified that Melton could not be terminated for testifying at Page's trial. Rec. vol. XIV, at 877. Melton's expert, Dr. George Kirkham, testified that the action taken against Melton was not based on his appearance as a trial witness. *Id.* vol. XI, at 554–55. Furthermore, the testimony of Melton himself along with members of the review board unequivocally indicates that Melton's appearance on behalf of Judge Page had nothing to do with his discharge. *E.g., id.* vol. X, at 253, vol. XIII, at 746, 829.

As the court notes, defense counsel did a less than desirable job throughout the trial of preserving error by contemporaneous objection. *See* Fed.R.Evid. 103 (rulings on evidence generally may not be assigned error unless brought to the attention of the trial judge); Fed.R.Civ.P. 51 (party generally may not assign error to an instruction unless objection is made prior to jury deliberation). Nevertheless, instruction five in my estimation is plain error. Despite the absence of evidence sufficient to carry Melton's burden, that instruction permitted the jury to find Melton's appearance as a defense witness for Judge Page a motivating factor in the defendants' decision to terminate Melton. This is a "particularly egregious error" which justifies invoking the plain-error exception to the contemporaneous objection rule. "[A] miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). *See also Corriz v. Naranjo*, 667 F.2d 892, 901 (10th Cir.) (Doyle, J., specially concurring) (instructions not properly objected to at trial to be reviewed where error may well have been a generating factor which culminated in unwarranted verdict or where a "miscarriage of justice may occur"), *cert. dismissed*, 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed. 2d 1394 (1982); 1 S. Childress & M. Davis, *Standards of Review* § 4.3 at 241–42 (1986) (federal appeals courts have fashioned a plain error exception in both criminal and civil cases by which to review unpreserved errors for a miscarriage of justice). Because no reasonable jury could find that Melton's testimony was the cause of his discharge on the evidence before it, the district court erred in failing to grant judgment to defendants on that point as a matter of law. No triable issue of fact is present if the evidence is so one-sided as to make a verdict for the opposing party impossible. *See Missouri Pac. R.R. Co. v. Kansas Gas & Elec. Co.*, 862 F.2d 796, 800 (10th Cir.1988).

### B.

The constitutional ramifications of Melton's disclosure to Page's defense counsel of the recorded conversation between himself and an assistant U.S. attorney are more troublesome. No doubt that disclosure was the "motivating factor" in Melton's discharge; the defendants so admitted throughout the trial. *E.g.,* rec. vol.

XII, at 660–61, vol. XIII, at 753. Problems arise, however, with regard to the protected status of this speech. Ultimately though, my concerns relate not to the court's result on this issue, but rather to the court's overbroad application of first amendment doctrine.

Whether Melton's speech addresses a matter of public concern depends on the content, context, and form of the conversation as revealed by the entire record. *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983). In *Koch*, 847 F.2d at 1445, we recently recognized that "[a]fter *Connick*, many courts have particularly focused on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of government officials in the conduct of their official duties." Speech which may be of general interest to the public is not automatically afforded first amendment protection. *Wilson v. City of Littleton*, 732 F.2d 765, 769 (10th Cir.1984). More recently, in *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir.1988), we emphasized that in analyzing whether speech constitutes a matter of public concern, the focus is on the motive of the speaker, "*i.e.*, whether the speech *was calculated* to disclose misconduct or dealt with only personal disputes and grievances with no relevance to the public interests." (emphasis in original).

In this case, the evidence shows that the government had interviewed Melton as a potential defense witness because he was a friend of Judge Page. Rec. vol. X, at 111. Melton informed an assistant U.S. attorney that monies Page received from a government informant may have been legitimate. Moreover, Melton directly placed the informant's credibility into question. *See id.* at 182–220 (transcript of taped conversation). Melton, however, recorded the interview for a purely private purpose. As a friend of Page, Melton believed he (Melton) was under surveillance and did not want to risk being misquoted. *Id.* at 110, 113, 182. Subsequently, Page's defense counsel asked Melton to appear as a character witness for the judge. During a discussion a few days before trial, defense counsel first became aware of the recording. *Id.* at 69–72. Melton allowed counsel to review the tape and prepare for Melton's signature an affidavit in support of a motion to dismiss the charges against Page based upon the government's failure to comply with *Brady v. Maryland*, 373 U.S. 83, 86–88, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) (prosecution's suppression of evidence favorable to an accused who has requested it violates due process), in violation of a court order. The trial judge in the Page prosecution denied the motion.

Notwithstanding the ruling of the trial judge in the Page prosecution, the district court in this case concluded that the information Melton provided the government was Brady material which the prosecution was obligated to give to the defense; and the court so instructed the jury in instruction five: "You are told that as a matter of law the conversation between the plaintiff and Prosecutor Fredenburg contained 'Brady' information that the prosecutor was obligated under court order to turn over to defense counsel in the Page case." Why defendants' counsel in this case did not press the prior court's ruling before the jury in view of Melton's continual references to a *Brady* violation in the Page prosecution, and why the district court declined to defer to the prior court's decision, remain unanswered. But because Melton was not a party or privy to the Page trial, he was not precluded from raising the issue anew in this case. *See generally* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* §§ 4448–49 (1981).

Melton's tape recording at least arguably contained colorable *Brady* material to which Page's defense was entitled. This conclusion alone, however, does not entitle Melton's actions to constitutional protection. We must still ask whether Melton disclosed the tape merely to help a friend in trouble—a purely private motive—or to disclose malfeasance on the part of the prosecution—a matter of public concern. Although the record provides no sure answers, Melton's testimony leads me to believe the latter:

Melton: I was asked about taking any notes first and I advised him no, I had not. And then he asked me if I had taped it, and I said yes, I did.

Counsel: Did he advise you or talk to you? Do you remember him talking to you about the Brady rule and the prosecutor and law enforcement's responsibility thereunder?

Melton: Yes, sir, he did. And I was somewhat familiar with Brady material prior to him discussing it with me, anyway.

Counsel: What was your state of mind? What did you think the obligation was under Brady at that time?

Melton: Well, one was it very explicit, that the prosecutor does turn over any information to the defense attorney. Whether requested or not, they're supposed to do it. That is the law, as I understand it, and as I understood it at the time talking to Mr. Goetcher [Page's defense counsel]. Mr. Goetcher reaffirmed this. And there were other considerations that were made in turning over the tape to the defense, not just based upon Brady. That was my biggest concern.

Counsel: What were the others?

Melton: The one was that it would show beyond a reasonable doubt in anyone's mind that I did, in fact, have an interview with Wes Fredenburg [assistant U.S. attorney], be no doubt whatsoever.

The second being that I had a moral obligation under my Code of Ethics to protect the innocent against deception, and also to—I can't quote—right now I can't quote the Code of Ethics verbatim.

But I did have this obligation under the first part of my Code of Ethics of duty.

I had no problem with turning over this tape to the U.S. Attorney on this. Also, it is a state and a federal law that if you have information regarding a case, that it doesn't make any difference whether it's for the defense or for the prosecution, and you're asked to supply that information, if you don't turn it over, you could be filed on in Court in a criminal action.

Counsel: Were you concerned about a possible obstruction?

Melton: I was concerned with that. I didn't want to get caught up in an obstruction of justice charge.

Rec. vol. X, at 120–21. This conversation leads to the court's justifiable conclusion that Melton's concern in disclosing the tape was public. Unlike the plaintiff in *Connick*, 461 U.S. at 148, 103 S.Ct. at 1690, Melton was seeking to provide exculpatory information which he believed it was his ethical duty to disclose and which the prosecution had not yet disclosed to defense counsel. Consequently, Meltons actions served to inform, albeit indirectly, the public that the prosecution may not have been fully discharging its responsibilities. But the inference contained in the court's opinion, court op. at 714, that "information relating to a public official's guilt or innocence" is necessarily a matter of public concern is impermissibly overbroad. The proper focus must remain principally upon the motive of the speaker. *Conaway*, 853 F.2d at 796–97; *Koch*, 847 F.2d 1445–47.[1]

Having determined that Melton's disclosure of the recorded conversation constituted a matter of public concern, the court next balances Melton's interest in relin-

---

1. The form and context of Melton's speech likewise fall within the realm of "public concern." In *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987), the Supreme Court found that plaintiff's private statement to a coworker nonetheless addressed a matter of public concern. Similarly, Melton's failure to express his concerns in a public forum does not remove them from first amendment protection. *Conaway*, 853 F.2d at 797.

The record reveals that the defendant's main objection to Melton's speech was its recorded nature. No one contested Melton's right to tape record his conversation with the prosecution or speak with defense counsel. Melton's death knell sounded when he handed over the purportedly confidential tape to Page's defense counsel. *See* rec. vol. XII at 660–61, XIII, at 752–53. Any reason, however, for affording a tape recording any less protection than simple recollection, written notes or the like escapes me.

quishing the tape with the state's interest in preserving a harmonious and effective police force, and concludes that "the City failed to make its case." Court op. at 716. In so doing, the court purports to establish a rule that "the government must introduce evidence of an *actual* disruption of its services resulting from the speech at issue." *Id.* at 715–16 (emphasis added). Such a rule, however, is absolutely contrary to Supreme Court precedent. As an inferior federal court, we therefore are not empowered to make such a sweeping pronouncement. *See Brown v. Allen,* 344 U.S. 443, 540, 73 S.Ct. 397, 427, 97 L.Ed. 469 (1953) (Jackson, J., concurring) ("We are not final because we are infallible, but we are infallible only because we are final").

In *Connick,* the plaintiff, an assistant district attorney, circulated a office questionnaire asking, among other things, whether the employees felt pressure from their superiors to work in political campaigns. The Court specifically rejected the view that once speech was held to be a matter of public concern, the government had the burden to "clearly demonstrate" that the speech "substantially interfered" with departmental operations. *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691. Instead, "the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Id.* The Court continued:

> When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action. We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern.

*Id.* at 151–52, 103 S.Ct. at 1692. The Court concluded that plaintiff's first amendment interest did not require the district attorney to "tolerate action which he *reasonably believed would disrupt* the office, undermine his authority, and destroy close

working relationships." *Id.* at 154, 103 S.Ct. at 1694 (emphasis added). Proof of actual disruption was unnecessary.

Admittedly, in *Rankin,* 107 S.Ct. at 2899, and *Pickering,* 391 U.S. at 570–71, 88 S.Ct. at 1735–36, the Court, while holding in favor of the employees, noted the respective employers' failure to present any evidence of office disruption. But these passing references to the employers' lack of evidence is a far cry from the judicial affirmation which the court today makes it out to be. In *Koch,* 847 F.2d at 1452 n. 22, we emphasized the "heightened governmental interest in maintaining harmony among employees in the law enforcement context, where '[mutual] trust and respect among [employees] ... are particularly important' and '[t]he need for confidentiality cannot be gainsaid.'" (quoting *Egger v. Phillips,* 710 F.2d 292, 319 (7th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983)). *Accord Conaway,* 853 F.2d at 798. Despite the court's contrary implication in this case, *Connick* binds us: The extent of the government's burden depends on the nature of the employee's speech. *Connick,* 461 U.S. at 152, 103 S.Ct. at 1692.

While recognizing in this case the police department's interest in preventing disruption to the close working relationship between law enforcement officials and prosecutors so vital to the administration of the criminal justice system, the first amendment rights of an employee seeking to ensure that the ends of justice are met by revealing evidence tending to exonerate a criminal defendant cannot be disregarded. As we recently stated in *Conaway,* 853 F.2d at 798: "It would be anomalous to hold that because the employee's whistle blowing might jeopardize the harmony of the office or tarnish the integrity of the department, the law will not allow him to speak out on his perception of potential improprieties...." Moreover, Melton did not voice his concerns to the media, but to an attorney. Any disruption to the Oklahoma City Police Department most likely resulted from its own publication of the charges against Melton. *See id.* at 798–99. Finally, the police department was not offi-

cially involved in the investigation of Judge Page. Rather, the investigation was solely a federal matter in which Melton played no official role. Considering all these factors, I am constrained to agree with the court's conclusion that Melton's first amendment interest in disclosing the recorded conversation outweighs the governmental interest at stake in this instance.

## II.

In contrast, the court's approach to Melton's claim that the defendants deprived him of property without due process of law in violation of the fourteenth amendment is wholly unacceptable. Before government employees are entitled to a pretermination hearing, they must first establish the presence of an interest protected by the Constitution:

A public employee facing discharge is entitled to the safeguards of procedural due process only if he can demonstrate that the termination implicates a property or liberty interest protected by the Due Process Clause; if a property or liberty interest is not implicated, he must settle for whatever procedures are provided by statute or regulation.

*Sipes v. United States,* 744 F.2d 1418, 1420 (10th Cir.1984). *See also Rosewitz v. Latting,* 689 F.2d 175, 177 (10th Cir.1982) ("normally the issue of whether the plaintiff has a property interest protected by the fourteenth amendment is dispositive"). In *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Supreme Court explained that to have a property interest in a benefit, an individual must enjoy "a legitimate claim of entitlement to it," rather than a mere "unilateral expectation of it."

## A.

Melton first asserts he was denied a property interest in his continued employment with the police department. Although ultimately concluding that Melton received the process due him under the standards set forth in *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the court

first determines that "the trial court did not err in ruling that Mr. Melton had a valid property interest in his continued employment." Court op. at 718 n. 15. The determination of whether Melton had a property interest in continued employment is a question of state law. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Melton's situation is directly controlled by our recent decision in *Graham v. City of Oklahoma City,* 859 F.2d 142 (10th Cir.1988). Therefore, the court need not reach the question of "what process is due."

In *Graham,* an Oklahoma City police officer filed suit against the City and Chief Gramling alleging, among other things, that his termination for purportedly filing a false police report deprived him of a property interest in employment without due process. We held that Graham did not possess a property interest under Oklahoma law because the Oklahoma City Charter grants "all power to discipline and discharge city employees to the city manager and specifically states 'removals and demotions shall be made solely for the good of the service.' " *Id.* at 146. Relying on *Umholtz v. City of Tulsa,* 565 P.2d 15 (Okla. 1977), we rejected, as the court must here, the argument that the Police Department Operations Manual created a property interest by providing for discharge only for cause. In *Umholtz,* the Oklahoma Supreme Court held the discipline procedures set forth by the police department did not legally affect the specific powers granted under the city charter. *Id.* at 22. *See also* 11 Okla.Stat. § 1–102(1) ("Once a municipal charter has been adopted and approved, it becomes the organic law of the municipality in all matter pertaining to the local government of the municipality and prevails over state law on matters relating to purely municipal concerns"). This case is indistinguishable from *Graham.* As we reasoned there, the Oklahoma City Charter is simply not sufficient to provide Melton a legitimate claim of entitlement to continued employment. *Graham,* 859 F.2d at 146.

## B.

Nor am I prepared to accept the court's cursory conclusion that Melton had a prop-

erty interest in his status as a retired police officer. Presumably, the provisions of the Oklahoma Municipal Police Pension and Retirement System, 11 Okla.Stat. §§ 50–101 to 50–136.1, govern Melton's involuntary retirement. The court reasons that § 50–125 establishes a protected interest for Melton as a retired police officer. Court op. at 719. That section reads in relevant part:

> Members retired under the provisions of this article *may* retain their status as peace officers of the State of Oklahoma, retired, and as such *may* retain the right to keep and bear firearms *when approved by the officials of the municipality of retirement.*

11 Okla.Stat. § 50–125 (emphasis added).

Contrary to the court's dubious construction, the plain language of § 50–125 indicates that whether retired officers "may retain" their status as peace officers and their right to possess firearms is entirely within the discretion of their superiors. Additionally, neither the court not Melton point to any rule or regulation which entitles him to wear his police uniform in security-type employment. Consequently, under Oklahoma law, Melton has no legitimate claim of entitlement to, and *a fortiori* no property interest in, any status as a retired police officer.

### III.

Melton likewise fails to prove under the applicable legal standard that defendants deprived him of a liberty interest without due process of law. In *Paul v. Davis,* 424 U.S. 693, 712, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976), the Supreme Court held that an individual's interest in a good name or reputation alone does not constitute liberty within the meaning of the fourteenth amendment. In *Asbill v. Housing Auth.,* 726 F.2d 1499, 1503 (10th Cir.1984), we later noted:

> In a series of cases, the [Supreme] Court has held that for an employee to make a successful liberty deprivation claim she must show that her dismissal resulted in the *publication* of information which was *false* and *stigmatizing*—information

which had the general effect of curtailing future freedom of choice or action.

(emphasis in original). Nevertheless, the court today erroneously holds that the police department's publication alone of perjury charges against Melton, subsequently dropped, impaired his "liberty interest in good name and reputation." Court op. at 721.

The perjury charges initially leveled against Melton and never publicly retracted may very well have had a stigmatizing effect upon him. But after his discharge, Melton apparently did not seek further employment as a police officer, and thus could only surmise that he could not obtain like employment. *Cf.* rec. vol. X, at 163–64. In *Conaway,* 853 F.2d at 789, we stated that "[a]bsent any evidence that Conaway's attempts to obtain other employment have been hindered by the charge of insubordination, we find that no protected liberty interest was infringed." Similarly, in *Ewers v. Board of County Comm'rs,* 802 F.2d 1242, 1249 (10th Cir.1986), *reh'g granted on other grounds,* 813 F.2d 1583 (1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 704, 98 L.Ed.2d 655 (1988), "we h[e]ld that Ewers failed to establish that the accusations stigmatized him in that they had the general effect of curtailing his future freedom of choice with regard to employment opportunities." These cases control this situation. Melton has not proven the defendants' deprived him of liberty; at most, he has stated a state law action in defamation.

Even assuming, however, that Melton proved stigmatization, the most to which he is entitled on the liberty issue is a new trial. The district court charged the jury in instruction seven that "[w]hen the termination is accompanied by public dissemination of the charges against him, and those charges would stigmatize the employee's reputation *or* foreclose future employment opportunities, due process requires that that employee be provided ... an opportunity to clear his name." (emphasis added). Under *Paul* and its progeny, this portion of instruction seven, which allowed the jury to find a liberty interest in reputation alone, is

simply wrong, and while unobjected to by defense counsel, constitutes plain error.

The court acknowledges *Paul*'s holding, court op. at 721, but then relies on our discussion in *Miller v. City of Mission*, 705 F.2d 368, 373 (10th Cir.1983), to uphold the district court's instruction. Admittedly, instruction seven essentially tracks a portion of the language in *Miller*. That portion, however, must be read in view of the court's actual holding in the case, 705 F.2d at 373, in order to avoid a conflict with *Paul*, which is binding Supreme Court authority. Concerning the sufficiency of the evidence, we held that the record contained "ample evidence from which the jury could have concluded that the circumstances surrounding Miller's termination placed a stigma on him, *and* as a practical matter foreclosed other employment opportunities." *Id.* (emphasis added). *See also Walker v. United States*, 744 F.2d 67, 69 n. 3 (10th Cir.1984) (*Paul v. Davis* held that "a liberty interest was not infringed when the *only* loss suffered at the hands of the government is a 'stigma' or damage to reputation") (emphasis in original).

Recently, in *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1412 n. 5 (10th Cir.1988), we directed the district courts to "cautiously and sparingly" charge the jury with appellate court dicta:

> "What an appellate Judge says for the Court does not mean that such language may, or should, be used as a jury charge. It all depends on whether the words presumably chosen by one artificer [appellate judge] for others of presumed like skill [trial judge] communicate the applicable legal principles to those [jurors] attending, as it were, their-once-in-a-life-time-law-school-for-a-day."

(quoting *United States Lines Co. v. Williams*, 365 F.2d 332, 335 (5th Cir.1966)). In this case, the district court should have recognized that the isolated segment drawn from *Miller* did not "communicate the applicable legal principles." To the extent *Miller* may be read as contrary to Supreme Court precedent, I am mindful of Judge Lamm's admonition of years ago: "To say that we proceed in the correction of errors

nisi, upon the theory we commit none ourselves tickles the judicial fancy, but is quite untrue." *Donnell v. Wright*, 199 Mo. 304, 97 S.W. 928, 932 (1906).

Moreover, the district court's failure to instruct the jury on the falsity requirement cannot be overlooked. *See* court op. at 722 & n. 21. Falsity is a fundamental element of Melton's case which he did not prove. *See Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977). Although the court noted that at trial defense counsel failed to timely object, that failure should be of no consequence in matters pertaining to well established legal principles which a plaintiff has the burden of proving before recovering a substantial damage award. *See Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1266 (10th Cir.1988) (plain error occurs where "substantial right" of party is affected).

Lastly, even if I were to agree that Melton was deprived of a liberty interest, the court's conclusion that he was entitled to a name-clearing hearing complete with the right to confront and cross-examine witnesses before an administrative review board finds no support in precedent. *See* court op. at 721–22. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). "In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545, 105 S.Ct. 1487, 1495, 84 L.Ed. 2d 494 (1985). Balancing Melton's interest in a good name, the police department's interest in discharging employee's guilty of misconduct, the avoidance of overwhelming administrative burdens, and the risk of a mistaken termination as required by *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), a trial-type proceeding on a charge which was not even the reason for Melton's release, is unwarranted. The police department's public retraction of the perjury charge indicating that no evidence existed to suggest Melton was guilty of perjury might well be suffi-

cient. But at most, Melton was entitled to written notice of the perjury charge, an explanation of the evidence and an opportunity to present his side of the story. *Koerpel v. Heckler,* 797 F.2d 858, 868–69 (10th Cir.1986). *See also Rosewitz v. Latting,* 689 F.2d 175, 177 (10th Cir.1982) ("The City ... has an important interest in efficient functioning of the city machinery which may be impeded by imposing a requirement of adversarial, trial-like hearings for every discharged employee").

## IV.

In view of my legal conclusion that Melton's discharge was based upon his constitutionally protected disclosure to Judge Page's defense counsel of the recorded conversation between himself and the government, the court properly reaches and decides the questions of municipal liability and qualified immunity as they pertain to the disclosure issue. Because the Oklahoma City Charter makes the City Manager ultimately responsible for the dismissal of city employees, and the manager approved the Disciplinary Review Board's decision to terminate Melton, rec. vol. XII, at 935, 938, Melton's discharge surely constitutes an act of official municipal policy for which municipal liability may be imposed under the reasoning of *Pembaur v. Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986) (if decision to follow particular course of action is made by government's authorized decisionmakers, it represents an act of official policy regardless of how many times the action is taken). But because the individual defendants' actions at the time of the incident were not proscribed by "clearly established law" of which reasonable officials would be aware, the court properly concludes that the principles of *Harlow v. Fitzgerald,* 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982), preclude their liability. Court op. at 730.

### *Conclusion*

Contrary to the court's approach, I would grant judgment as a matter of law in favor of all the defendants on Melton's claim that he was deprived of property and liberty without due process of law, as well as on the claim that his discharge was based upon his trial testimony for Judge Page in violation of the first amendment. I would grant qualified immunity to the individual defendants on Melton's remaining first amendment claim surrounding disclosure of the tape recording, but remand for a new trial on the issue of damages to be assessed against the City of Oklahoma City for discharging Melton for an impermissible reason; namely, disclosure of a tape recording protected by the first amendment.

Accordingly, I concur in part and dissent in part.